IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

MARIE-JOSÉE GRIMARD, AS SPECIAL )
ADMINISTRATOR OF THE ESTATE OF )
HENRIETTE LATULIPPE, DECEASED, )
           )    CASE NO.:
          Plaintiff, )
           )
       vs. )
           )
RAIL WORLD, INC.; RAIL WORLD )    TRIAL BY JURY DEMANDED
HOLDINGS LLC; RAIL WORLD )
LOCOMOTIVE LEASING LLC; )
EDWARD A. BURKHARDT, )
CANADIAN PACIFIC )
RAILWAY COMPANY; WORLD FUEL )
SERVICES CORPORATION; WORLD )
FUEL SERVICES, INC.; WORLD )
FUEL SERVICES, CANADA, INC.; )
WESTERN PETROLEUM CO; )
PETROLEUM TRANSPORT )
SOLUTIONS, LLC;   IRVING OIL )
LIMITED; IRVING OIL COMPANY )
LIMITED; IRVING OIL OPERATIONS )
GENERAL PARTNER LIMITED; )
IRVING OIL COMMERCIAL G.P.; )
STROBEL STAROSTKA TRANSFER )
LLC; DAKOTA PLAINS MARKETING, )
LLC; DAKOTA PLAINS HOLDINGS, )
INC; DPTS MARKETING,   INC; )
DAKOTA PLAINS TRANSLOADING )
LLC; DAKOTA PETROLEUM )
TRANSPORT SOLUTION LLC; )
SMBC RAIL SERVICES, LLC; )
UNION TANK CAR COMPANY; )
UTLX INTERNATIONAL DIVISION )
OF UTCC; THE MARMON GROUP )
LLC; PROCOR LIMITED; )
FIRST UNION RAIL CORPORATION; )
GENERAL ELECTRIC RAILCAR )
SERVICES CORPORATION; )
GENERAL ELECTRIC COMPANY; )
TRINITY INDUSTRIES, INC.; )
TRINITY INDUSTRIES LEASING )
COMPANY; TRINITY TANK CAR, )
INC.; TRINITY RAIL LEASING 2012 )

1

LLC; TRINITY RAIL GROUP, LLC;                      )
INCORR ENERGY   GROUP, LCC;                         )
ENSERCO ENERGY, LLC;                               )
CONOCOPHILLIPS COMPANY;                            )
SHELL OIL COMPANY and SHELL                        )
TRADING (US) COMPANY;                              )
DEVLAR ENERGY MARKETING                            )
LLC., together with their parent                    )
companies, LARIO OIL & GAS                         )
COMPANY and DEVO TRADING &                         )
CONSULTING CORPORATION;                            )
OASIS PETROLEUM INC. and OASIS                     )
PETROLEUM LLC; INLAND OIL                          )
& GAS CORPORATION; WHITING                         )
PETROLEUM CORPORATION;                             )
ENERPLUS RESOURCES (USA)                           )
CORPORATION; HALCON                                )
RESOURCES CORPORATION;                             )
TRACKER RESOURCES; KODIAK                          )
OIL & GAS CORP (now known as                       )
WHITING CANADIAN HOLDING                           )
COMPANY, ULC); GOLDEN                              )
EYE RESOURCES, LLC; ARROW                          )
MIDSTREAM HOLDINGS, LLC;                           )
MARATHON OIL COMPANY;                              )
QEP RESOURCES, INC; SLAWSON                        )
EXPLORATION COMPANY, INC;                          )
                                                    )
        Defendants.                                  )

## <u>AMENDED COMPLAINT AT LAW</u>

NOW COMES the Plaintiff, Marie-Josée Grimard,  as Special Administrator of the

Estate of Henriette Latulippe, deceased, by and through her attorneys, MEYERS & FLOWERS,

LLC, THE WEBSTER LAW FIRM, and GROSS, MINSKY & MOGUL, P.A., complaining

against Defendants, RAIL WORLD, INC.; RAIL WORLD HOLDINGS LLC; RAIL WORLD

LOCOMOTIVE LEASING LLC; EDWARD A. BURKHARDT, individually; CANADIAN

PACIFIC RAILWAY COMPANY; WORLD FUEL SERVICES CORPORATION; WORLD

FUEL SERVICES, INC.; WORLD FUEL SERVICES, CANADA, INC.; WESTERN

PETROLEUM  CO;  PETROLEUM  TRANSPORT  SOLUTIONS,  LLC;  IRVING  OIL

LIMITED; IRVING OIL COMPANY LIMITED; IRVING OIL OPERATIONS GENERAL PARTNER LIMITED and IRVING OIL COMMERCIAL G.P.; STROBEL STAROSTKA TRANSFER LLC; DAKOTA PLAINS MARKETING, LLC; DAKOTA PLAINS HOLDINGS, INC; DPTS MARKETING, INC; DAKOTA PLAINS TRANSLOADING LLC; DAKOTA PETROLEUM TRANSPORT SOLUTION LLC; SMBC RAIL SERVICES; UNION TANK CAR COMPANY; UTLX INTERNATIONAL DIVISION OF UTCC; THE MARMON GROUP LLC; PROCOR LIMITED; FIRST UNION RAIL CORPORATION; GENERAL ELECTRIC RAILCAR SERVICES CORPORATION; GENERAL ELECTRIC COMPANY; TRINITY INDUSTRIES, INC.; TRINITY INDUSTRIES LEASING COMPANY; TRINITY TANK CAR, INC.; TRINITY RAIL LEASING 2012 LLC; TRINITY RAIL GROUP, LLC; INCORR ENERGY GROUP, LCC; ENSERCO ENERGY, LLC; CONOCOPHILLIPS COMPANY; SHELL OIL COMPANY and SHELL TRADING (US) COMPANY; DEVLAR ENERGY MARKETING, LLC., together with their parent companies, LARIO OIL & GAS COMPANY and DEVO TRADING & CONSULTING CORPORATION; OASIS PETROLEUM INC. and OASIS PETROLEUM LLC; INLAND OIL & GAS CORPORATION; WHITING PETROLEUM CORPORATION; ENERPLUS RESOURCES (USA) CORPORATION; HALCON RESOURCES CORPORATION; TRACKER RESOURCES, KODIAK OIL & GAS CORP (now known as WHITING CANADIAN HOLDING COMPANY, ULC); GOLDEN EYE RESOURCES, LLC; ARROW MIDSTREAM HOLDINGS, LLC; MARATHON OIL COMPANY; QEP RESOURCES, INC; SLAWSON EXPLORATION COMPANY, INC; states as follows:

## Introduction

On June 29, 2013 in New Town, North Dakota, highly volatile crude oil was loaded into seventy-two rail tanker cars, which were wholly unsuitable for such dangerous cargo, and then routed through heavily populated metropolitan areas of the United States, including the City of Chicago, towards their final destination, a refinery in Saint John, New Brunswick, Canada. The tanker cars never reached the refinery.  Shortly after midnight on July 6, 2013, the tanker cars, left unattended overnight, rolled downhill seven and one-half miles and derailed in the town of Lac-Mégantic, in the Province of Quebec, Canada.  The unsafe tanker cars ruptured; the crude oil within exploded; and fireballs engulfed the town center.  Forty-eight people died as a result, including the Plaintiff's decedent, Henriette Latulippe.

Montreal Maine & Atlantic Railway, Ltd. ("Debtor") filed a voluntary petition under Chapter 11 of Title 11 U.S.C. in the United States Bankruptcy Court for the District of Maine on August 7, 2013 bearing docket number 13-10670.

## The Parties

1.   Plaintiff Marie-Josée Grimard has been appointed as the Special Administrator of the Estate of Henriette Latulippe, deceased, who was killed in the Disaster.  Henriette Latulippe was a Canadian citizen and a resident of the town of Lac-Mégantic, Quebec. Plaintiff Marie-Josée Grimard is the surviving daughter of Henriette Latulippe.

2.   Defendant Rail World, Inc. ("RailWorld") is an Illinois corporation with corporate offices in the Village of Rosemont, Cook County, Illinois.

3.   Defendant Rail World Holdings LLC ("RW Holdings") is a Delaware limited liability company with its principle place of business in the Village of Rosemont, Cook County, Illinois.

4.   Defendant Rail World Locomotive Leasing LLC ("RW Locomotive") is a Delaware limited liability company with its principal place of business in Village of Rosemont, Cook County, Illinois.

5.   Defendant Edward A. Burkhardt ("Burkhardt") is the President and Chief Executive Officer of RailWorld, the Chairman and Chief Executive Officer of RW Locomotive, and the Chairman of the Montreal, Maine and Atlantic, Inc., the railroad which operated the train at the time of the Disaster and a wholly owned subsidiary of RailWorld.  Burkhardt is a resident of Cook County, Illinois.

6.   Defendant, Canadian Pacific Railway Company ("CP-Railroad") is a Canadian company, headquartered in Calgary, Alberta, Canada, with corporate offices in Minneapolis, Minnesota, and operates its trains throughout Canada and the United States, including the State of Illinois.

7.   Defendant World Fuel Services Corporation ("WorldFuel") is a Florida corporation with corporate offices in Miami, Florida, as well as in Chicago, Illinois.

8.   Defendant World Fuel Services, Inc. is a Texas corporation with corporate offices in Miami, Florida, Dallas, Texas, and is a wholly owned subsidiary of WorldFuel.

9.   Defendant World Fuel Services Canada, Inc.is a Delaware corporation with its principal place of business in Miami, Florida and is a wholly owned subsidiary of WorldFuel.

10.  Defendant Western Petroleum Company (hereinafter "WesternPetro") is a Minnesota corporation with its principal place of business in Plymouth, Minnesota, and is a wholly owned subsidiary of WorldFuel.

11.  Defendant Petroleum Transport Solutions, LLC ("PetroTransport") is a Minnesota limited liability company with its principal place of business in Plymouth, Minnesota, and is a wholly owned subsidiary of WesternPetro.

12. Defendant Irving Oil Limited ("IrvingLtd") is a foreign corporation with its principal place of business in Saint John, New Brunswick, Canada.

13. Defendant Irving Oil Company Limited ("IrvingCoLtd") is a Delaware corporation with its principal place of business in Portsmouth, New Hampshire.

14. Defendant Irving Oil Operations General Partner Limited ("IrvingGP") is a foreign corporation with its principal place of business in Saint John, New Brunswick, Canada.

15. Defendant Irving Oil Commercial GP ("IrvingCommercial") is a foreign corporation with its principal place of business in Saint John, New Brunswick, Canada.

16. Defendant Strobel Starostka Transfer ("Strobel") is a Nebraska limited liability company with its principal place of business in Mustang, Oklahoma.

17. Defendant Dakota Plains Marketing, LLC ("DakotaMarketing") is a Minnesota limited liability company with its principal place of business in Wayzata, Minnesota, and is a wholly owned subsidiary of Dakota Plains Holdings, Inc., a Nevada corporation.

18. Defendant Dakota Plains Holdings, Inc. ("DakotaHoldings") is a Nevada corporation with its principal place of business in Wayzata, Minnesota.

19. Defendant DPTS Marketing, LLC ("DPTS") is a Minnesota limited liability company with its principal place of business in Minneapolis, Minnesota, and whose members are PetroTransport and DakotaMarketing.

20. Defendant Dakota Plains Transloading, LLC ("DakotaTransloading") is a Minnesota limited liability company with its principal place of business in Wayzata, Minnesota, and is a wholly owned subsidiary of DakotaHoldings.

21. Defendant Dakota Petroleum Transport Solutions, LLC ("DakotaTransport") is a Minnesota limited liability company with its principal place of business in Wayzata,

Minnesota. Defendants PetroTransport and DakotaTransloading each own a fifty percent (50%) membership interest in DakotaTransport.

22. Defendant SMBC Rail Services LLC ("SMBC") is a Delaware Limited Liability Company with its principal place of business in Chicago, Illinois.

23. Defendant Union Tank Car Company ("UTCC") is a Delaware Corporation with its principal place of business in Chicago, Illinois.

24. Defendant UTLX International Division of UTCC is a wholly owned subsidiary of Union Tank Car Company, a Delaware Corporation with its principal place of business in Chicago, Illinois.

25. Defendant, The Marmon Group, LLC, ("Marmon") is a Delaware limited liability company with corporate offices in Chicago, Illinois.

26. Defendant Procor Limited ("Procor") is a foreign company headquartered in Oakville, Ontario, and wholly owned subsidiary of Union Tank Car Company.

27. First Union Rail Corporation ("First Union") is a North Carolina Corporation with its principal place of business in the Village of Rosemont, Cook County, Illinois.

28. Defendant General Electric Railcar Services Corporation ("GE Rail") is a Delaware corporation with its principal place of business in Chicago, Illinois.

29. Defendant General Electric Company ("GE Company") is a New York corporation with its principal place of business in Fairfield, Connecticut.

30. Defendant Trinity Industries, Inc. ("Trinity") is a Delaware corporation, with its principal place of business in Dallas, Texas.

31. Defendant Trinity Industries Leasing Company ("Trinity Leasing") is a Delaware Corporation with its principal place of business in Dallas, Texas.

32. Defendant Trinity Tank Car, Inc. ("Trinity Tank") is a Delaware corporation with its

principal place of business in Dallas, Texas.

33. Defendant Trinity Rail Leasing 2012 LLC ("TRL-2012") is a Delaware limited liability company with its principal place of business in Dallas, Texas.

34. Defendant Trinity Rail Group, LLC ("TrinityRail") is a Delaware limited liability company with its principal place of business in Dallas, Texas.

35. Defendant Incorr Energy Group LLC ("Incorr") is a Colorado Limited Liability Company with its principal place of business in Centennial, Colorado.

36. Defendant Enserco Energy, LLC ("Enserco") is a Delaware Limited Liability Company with its principal place of business in Denver, Colorado.

37. Defendant ConocoPhillips Company ("ConocoPhillips") is a Delaware corporation with its principal place of business in Houston, Texas.

38. Defendant Shell Oil Company ("Shell") is a Delaware corporations with its headquarters in Houston, Texas.

39. Defendant Shell Trading (US) Company ("ShellTrading") is a Delaware corporation with its headquarters in Houston, Texas.

40. Defendant Devlar Energy Marketing LLC ("Devlar") is a Colorado Limited Liability company with its principal place of business in Englewood, Colorado.

41. Defendant Lario Oil & Gas Company ("Lario") is a Colorado Limited Liability Company with principal places of business in Englewood, Colorado and Wichita, Kansas.

42. Defendant Devo Trading & Consulting Corporation ("Devo") is a Colorado Corporation with its principal place of business in Pagosa Springs, Colorado.

43. Defendant Oasis Petroleum Inc. ("Oasis Inc.") is a Delaware corporation with its principal place of business in Houston, Texas.

44. Defendant Oasis Petroleum, LLC ("Oasis LLC") is a Delaware corporation with its

principal place of business in Houston, Texas.

45. Defendant Inland Oil & Gas Corporation ("Inland") is a North Dakota corporation with its principal place of business in Bismarck, North Dakota.

46. Defendant Whiting Petroleum Corporation ("Whiting") is a Delaware corporation with its principal place of business in Denver, Colorado.

47. Defendant Enerplus Resources (USA) Corporation ("Enerplus") is a Delaware corporation with its principal place of business in Denver, Colorado.

48. Defendant Halcon Resources Corporation ("Halcon") is a Delaware corporation with its principle place of business in Houston, Texas.

49. Defendant Tracker Resources ("Tracker) is a Delaware corporation with its principal place of business in Denver, Colorado.

50. Defendant Kodiak Oil & Gas Corp. (now known as Whiting Canadian Holding Company, ULC) ("Kodiak") is a foreign limited liability company incorporated in British Columbia, Canada, with its principal place of business in Denver, Colorado.

51. Defendant Golden Eye Resources LLC ("Golden Eye") is a Colorado limited liability company with its principal place of business in Greenwood Village, Colorado.

52. Defendant Arrow Midstream Holdings LLC ("Arrow") is a Delaware Limited Liability Company with its headquarters in Tulsa, Oklahoma.

53. Defendant Marathon Oil Company ("Marathon") is an Ohio Corporation with its headquarters in Houston, Texas.

54. Defendant QEP Resources, Inc. ("QEP") is a Delaware Corporation with its headquarters in Denver, Colorado.

55. Defendant Slawson Exploration Company, Inc. ("Slawson") is a Kansas Corporation with its principal place of business in Wichita, Kansas.

**Background-Common Allegations**

**<u>Volatility of Bakken Crude Oil</u>**

56. The freight train that derailed in Lac-Mégantic on July 6, 2013 consisted of seventy-two tank cars loaded with crude oil which was produced from the Bakken Formation.

57. The "Bakken Formation" is a sub-surface rock formation covering approximately two hundred thousand square miles in the States of Montana and North Dakota, as well as the Canadian Provinces of Saskatchewan and Manitoba.

58. Crude oil has been extracted from the Bakken Formation for more than sixty years; however, until recently, production was comparatively low due to the expense of extraction.

59. In recent years, advancements in technology, including the combination of hydraulic fracking (fracturing the subsurface of rock by injecting water, sand, and/or chemicals) and horizontal drilling, have dramatically increased crude oil production from the Bakken Formation.

60. Since 2006, crude oil production from shale in the Bakken Formation in North Dakota has increased 150-fold to more than 660,000 barrels a day, moving the state into second place among domestic suppliers.

61. Prior to the boom in oil production from the Bakken Formation, the petroleum industry regarded North American crude oil as presenting a low risk of spontaneous ignition because of its relatively high flash point. However, crude oil extracted from the Bakken Formation is different, as the petroleum industry knows. Much of the crude oil extracted from wells in the Bakken Formation includes other materials, including volatile vapors, gases, and liquids such as propane, butane, and natural gasoline. These vapors, gasses, and liquids are often explosive and can self-ignite at

low ambient temperatures.

62. There are no petroleum refineries located in or around the State of North Dakota, nor is there a pipeline system to transport crude oil extracted from the Bakken Formation in North Dakota to oil refineries.  Such transportation is accomplished almost entirely by rail.

63. Cargo volatility is an important consideration in determining rail car selection as well as applicable safety procedures and protocols to be implemented with respect to any shipment of hazardous material.

64. A party offering a hazardous material for shipment in the United States or Canada has the duty, among others: (i) to properly identify and classify all hazardous materials related to the shipment; (ii) to determine which hazard class or classes characterize the hazard(s) associated with the material; (iii) to assign each material to a packing group, if applicable; and (iv) to ensure that the hazardous material is transported in appropriate packaging.

65. Regulations applicable to the Canadian Transportation of Dangerous Goods Act (SOR/DORS/2001-286 ("TDGR"), in effect as of July 6, 2013, require, for example, that "[b]efore allowing a carrier to take possession of dangerous goods for transport, the consignor must determine the classification of the dangerous goods in accordance" with the regulations. TDGR §2.2(1). "When importing goods into Canada, the consignor must ensure that [the goods] have the correct classification before they are transported into Canada." TDGR §2.2(2). Additionally, "if an error in classification is noticed or if there are reasonable grounds to suspect an error in classification the consignor must not allow a carrier to take possession of the dangerous goods for transport until the classification has been verified or corrected." TDGR §2.2(5). Any carrier who "notices an error in classification or has reasonable grounds to suspect an error in classification while the goods are in transport must advise the consignor and must stop transporting the dangerous

goods until the consignor verifies or corrects the classification." TDGR §2.2(6). "'Classification' means, for dangerous goods, as applicable, the shipping name, the primary class, the compatibility group, the subsidiary class, the UN number, <u>the packing group</u>, and the infection substance category." TDGR §1.4 (emphasis supplied).

66. There are nine recognized classes of hazardous substances in the United States and Canada. These classes define the type of risk a hazardous material may pose.

67. Crude Oil falls within "Hazard Class 3 – Flammable Liquids."

68. Within each hazard class there are distinct packing group designations that indicate the degree of risk a hazardous material poses in transport in relation to other materials within the same hazard class.

69. There are three packing groups applicable to Class 3 Hazardous Materials: Packing Group I, indicating high danger; Packing Group II, indicating moderate danger; and Packing Group III, indicating low danger.

70. Classification within these packing groups is determined by the material's flash point and initial boiling point, as follows:

| Packing Group | Flash Point | Initial Boiling Point |
|---|---|---|
| I | | ≤ 35°C (95°F) |
| II | ≤ 23°C (73°F) | > 35°C (95°F) |
| III | ≥ 23°C (73°F) but ≤ 60.5°C (141°F) | > 35°C (95°F) |

71. Prudent and safe shipping practices dictate that, in order to properly classify and identify a particular shipment of crude oil, its properties must be determined. These properties include, but are not limited to, its flash point, corrosivity, specific gravity at loading, and reference temperatures as well as the presence and concentration of other compounds.

72. The proper determination of the properties of a particular shipment of crude oil is also necessary to: (i) select the proper tank car packaging; (ii) ensure that the proper tank car outage -- the "head space" or amount of unfilled space in the tank car -- is maintained; and (iii) devise and implement appropriate transportation safety procedures and protocols.

### Unsuitability of DOT-111 Tanker Cars to Transport Crude Oil

73. The transportation of crude oil by train in the United States and Canada has been accomplished by tanker cars, with the bulk of such shipments being made by the tanker car design known as the "DOT-111" and "DOT-111A" in the United States and as the "CTC-111A" in Canada (hereinafter collectively referred to as the "DOT-111").

74. For more than twenty years, problems with DOT-111 tankers rupturing upon derailment have been well documented by governmental safety regulators and media outlets. For example, the Associated Press, upon review of United States federal accident data, found that DOT-111 tankers carrying ethanol had breached in forty serious incidents since 2000.

75. As train derailments are an inevitable aspect of rail transport, for over thirty years governmental safety regulators have been warning the rail transport industry of the defects in the DOT-111 tankers which make them susceptible to breach.

76. On February 12, 1990, the United States National Transportation Safety Board ("NTSB") issued Safety Recommendation R-89-80, which urged the Department of Transportation ("DOT") to: "Evaluate present safety standards for tank cars transporting hazardous materials by using safety analysis methods to identify the unacceptable levels of risk and

the degree of risk from the release of a hazardous material, and then modify existing regulations to achieve an acceptable level of safety for each product/tank car combination."

77. The NTSB labeled Safety Recommendation R-89-80 as a "Class II, Priority Action," noting that the problem had largely been ignored by the petroleum and transport industries.

78. The NTSB was so concerned about the danger that DOT-111 tanker cars posed to the public that it elevated Safety Request R-89-80 to the NTSB's "Most Wanted List," which list was intended to bring special emphasis to the safety issues the Board deems most critical.

79. In July, 1991, the "NTSB issued Safety Recommendation R-91-20 which clearly identified the danger of the continued use of the DOT-111 to transport hazardous materials, noting: "The inadequacy of the protection provided by DOT-111A tank cars for certain dangerous products has been evident for many years in accidents investigated by the Safety Board.   The release of products from DOT-111A tank cars observed in those investigations were also observed in the 45 rail accidents investigated by the Safety Board from March 1988 through February 1989 as part of its recent safety study."

80. The NTSB issued Safety Recommendation R-91-20 directly to rail transport and petroleum industry groups, including the American Association of Railroads (the "AAR"), which  is the railroad transport industry's trade group, and  the American Petroleum Institute (the "API"), the trade group that represents the producers of petroleum products.

81. In its direct recommendation to the AAR and the API, the NTSB urged them "to expeditiously improve the packaging of the more dangerous products (such as those that are highly flammable or toxic, or pose a threat to health through contamination of the environment) by (a) developing a list of hazardous materials that should be transported only in pressure tank cars with head shield protection and thermal protection (if needed);

and (b) establishing a working agreement to ship the listed hazardous materials in such tank cars."

82. The AAR, the API, and the transport industry ignored Safety Recommendation R-91-20 and did nothing to address the dangerous design flaws in the DOT-111 tanker cars which made them unsafe to transport flammable materials posing a catastrophic threat to life, property, and the environment.

83. On March 2, 2012 the NTSB issued Safety Recommendation R-12-5, 6, 7 & 8 (referred to herein collectively as "R-12-5"), and requested that the Federal Pipeline and Hazardous Materials Safety Administration, an agency with the authority to impose safety regulations on the transport industry, mandate that all existing DOT-111 tanker cars be retrofitted with the safety design features which the AAR acknowledged were lacking.

84. In Safety Recommendation R-12-5, the NTSB noted that the AAR's proposal to address only newly purchased DOT-111 did not significantly decrease the threat to the public: "The revised AAR standard would address tank cars constructed after the changes are published and would not be expected to require retrofitting of the tank car fleet existing at the time the changes are published.  Given the estimated tank car service life of 30 to 40 years, this represents the potential for tank cars with susceptibility to tank failure … to exist long after changes are made to the design standards."

85. In Safety Recommendation R-12-5, the NTSB also noted that the industry shift toward the use of single cargo "unit trains" to transport petroleum products further magnifies the risk of catastrophic damage to persons, property, and the environment because a typical "unit train" transporting 75 to 100 tanker cars will unleash 2.1 to 2.8 million gallons of petroleum if it derails and the cars rupture.

86. The AAR and its membership successfully thwarted and defeated Safety Recommendation

R-12-5 and continued to utilize DOT-111s tank cars despite their susceptibility to rupture.

87. Prudent and safe shipping practices dictate that hazardous flammable liquids that are explosive and capable of self-igniting at low ambient temperatures should not be transported in DOT-111 tank cars that do not have reinforced shells, heads shields, valves, and other exposed fittings, unless the train operator is able to implement enhanced safety procedures and protocols to prevent or minimize the risk of derailment.

88. Prudent and safe shipping practices further dictate that the volatility and flammability of hazardous cargo be properly documented and that every party involved in the extraction, loading, transporting, and refining of crude oil properly document and confirm the volatility and flammability of hazardous cargo.

89. Prudent and safe shipping practices further dictate that every party involved in the extraction, loading, transporting and refining of highly volatile crude oil insure that enhanced safety procedures and protocols are established and followed to prevent or minimize the risk of derailment.

**The Decimation of Lac-Mégantic**

90. On or about June 29, 2013, Defendants WorldFuel and DakotaHoldings (and/or their subsidiaries, joint ventures, and/or agents) fulfilled an order from Irving Oil Company ("Irving") to ship seventy-eight tank cars of crude oil from New Town, North Dakota to Irving's refinery in Saint John, New Brunswick, Canada (the "Irving Shipment").

91. Defendants WorldFuel and DakotaHoldings (and/or their subsidiaries, joint ventures, and/or agents) obtained the crude oil for the Irving Shipment from eleven different "Suppliers" who owned or operated wells located within the North Dakota Bakken Formation.

92. The Suppliers arranged to ship the crude oil by tanker truck from their wells to the rail

loading facility in New Town, North Dakota (the "New Town Transloading Facility"), where the Irving Shipment was transloaded from tanker trucks into rail tanker cars. As each rail tanker car held approximately three truckloads of crude oil, the transloading process filled the tank cars with a blend of crude oil from a variety of Supplier sources.

93. Upon information and belief, for all times relevant to Plaintiff's claims, the New Town Transloading Facility was owned, managed and operated by Defendants Strobel, WorldFuel and DakotaHoldings (and/or their subsidiaries, joint ventures, and/or agents).

94. The designation of the volatility of the crude oil listed in material safety data sheets provided by the Suppliers of the Irving Shipment varied widely and was, at times, contradictory. While all Suppliers identified the cargo as a "Class 3 – Flammable Liquid," some Suppliers designated their shipment as "Packing Group I" (high danger), some Suppliers designated their shipment as "Packing Group II" (moderate danger), and only one Supplier designated the shipment as "Packing Group III" (low danger). Two of the Suppliers admitted that accurate classification was impossible unless testing was conducted to determine the crude oil's flash point. By volume, more than a quarter of the crude oil had been designated as Packing Group I, indicating the highest level of danger.

95. All of the tanker trucks that delivered the Irving Shipment to the New Town Transloading Facility listed their cargo as "Packing Group II" (moderate danger) on their safety data sheets.

96. Notwithstanding the varied and sometimes conflicting product classifications provided by the Suppliers, the crude oil in each and every one of the seventy-eight DOT-111 tank cars that comprised the Irving Shipment left New Town classified as "Packing Group III," indicating a high flash point and high initial boiling point and, hence, a low danger.

97. None of the Defendants involved in the transportation of the Irving Shipment conducted a

proper investigation or analysis to determine the correct packaging classification of Irving's Shipment.

98. Defendants knew, or had reason to know, that the testing and classification of Bakken crude oil was inadequate.

99. Less than a month before the derailment, an Irving refinery employee gave a presentation at a Crude Oil Quality Association conference in Seattle, Washington noting that rail car crude cargo is a co-mingled product, that Irving's refinery had encountered rail cars with three different crude types, and recommending more testing at loading terminals to "identify issues related to safety of personnel or specification while the rail car is in transit."

100. Irving's Shipment of crude oil was loaded into DOT-111 tank cars that were leased by Defendant WesternPetro and SMBC, among others, and then subleased to Defendant DPTS.

101. Upon information and belief, the DOT-111 tank cars used to transport the Irving Shipment had been manufactured prior to 2011 and had not been retrofitted with reinforced shells, head shields, valves, or other exposed fittings and were, therefore, subject to a high risk of rupture in the event of a collision or derailment.

102. The transportation of the Irving Shipment was arranged by Defendants CP-Railway, Irving, Strobel, WorldFuel, and DakotaHoldings (and/or their subsidiaries, joint ventures, and/or agents), with CP-Railway transporting the shipment from the facility in New Town, North Dakota as far as Cote Saint-Luc where it was transferred to the Debtor

103. The Defendants arranged for the transport of the misclassified Irving Shipment through heavily populated urban areas in the United States and Canada, including Minneapolis, Milwaukee, Chicago, Detroit, Windsor, and Montreal.

18

104. All of the Defendants were aware or should have been aware that the transport of misclassified highly volatile crude oil in unsuitable tanker cars through densely populated urban areas, such as Chicago, Illinois, puts the public at unreasonable risk of catastrophic injury and death.

105. At all times relevant to this Complaint, the Montreal Maine & Atlantic Canada Co. and its parent the Montreal, Maine and Atlantic Railway, Inc. (collectively the "Debtor") operated an integrated, international shortline freight railroad system involving five hundred a n d  ten miles of track located in the States of Maine and Vermont, and the Canadian Province of Québec.

106. The Debtor was wholly owned and managed by a company controlled by Edward Burkhardt ("Burkhardt"), who had a reputation in the railway transportation industry for cutting costs at the expense of safety.

107. Among Defendant Burkhardt's characteristic successes that preceded and presaged the Lac-Mégantic disaster was the formation of the Wisconsin Central Transportation Corporation and the purchase of assets of a division of the struggling Soo Line operations.

108. Defendant Burkhardt designed a business plan to reduce costs from the Soo Line operation's by disbanding the union and union work rules and reducing crew sizes on freight trains from an average of 4.8 employees per train to 2.2 employees per train.

109. Under Defendant Burkhardt's control, the Wisconsin Central Transportation Corporation established profitability, went public as Wisconsin Central Ltd (hereinafter "Wisconsin Central"), but was operated with a dramatically increased accident rate.

110. On March 4, 1996, a Wisconsin Central locomotive, manned by a single engineer, derailed in the center of the town of Weyauwega, Wisconsin, sending 34 cars off the tracks, 14 of which were carrying propane or liquefied petroleum. An explosive fire

erupted, and more than 1,700 Weyauwega residents were forced to flee their homes.

111. The NTSB concluded that the probable cause of the Weyauwega accident was "…improper maintenance because Wisconsin Central management did not ensure that the two employees responsible for inspecting the track structure were properly trained."

112. In November 1997, another Wisconsin Central train derailed, plowing into a factory in Fond du Lac, Wisconsin and causing the first train derailment death in Wisconsin in eleven years.

113. In 1997 federal rail safety officials subjected Wisconsin Central to a thorough safety inspection because its accident rate was two to three times above the industry norm.

114. The Debtor had a train operation safety record three times worse than the industry average.

115. Prior to the tragedy in Lac-Mégantic, Defendants knew or should have known that the Debtor had established a poor safety record in regard to the maintenance and operation of its equipment and tracks.

116. Despite its poor safety record, at all times relevant to Plaintiff's Complaint, the Debtor operated its trains with a single engineer.

117. Prior to the tragedy in Lac-Mégantic, Defendants knew or should have known that the Debtor operated its trains with a single engineer.

118. On July 5th, 2013 just outside Montreal, Quebec, Defendant CP-Railroad transferred the remaining seventy-two tanker cars of the Irving Shipment to the Debtor.[1]

119. All of the Defendants were aware or should have been aware that the transport of misclassified highly volatile crude oil in tanker cars prone to rupture by trains operated by a single man employed by a rail carrier with a poor safety record

---

[1] Six of the original seventy-eight rail tanker cars were unable to complete the trip due to mechanical problems.

through populated urban areas, such as Lac-Mégantic, Quebec, put the public at unreasonable risk for catastrophic injury and death.

120. Shortly before midnight on July 5, 2013, the Debtor engineer parked the Irving Shipment on its main track near the town of Nantes, Quebec and, pursuant to company policy, left it unattended for the night. The main track at this location had a slight descending grade of approximately 1.2%.

121. At or around 1:00 a.m. on July 6, 2013, the unattended train started to move downgrade.

122. At or about 1:15 a.m., the unattended runaway train entered downtown Lac-Mégantic at a high rate of speed.

123. Although Debtor's locomotive engines were able to negotiate a sharp curve in the tracks, the DOT-111 tankers, with their higher center of gravity, began derailing.

124. Sixty-three DOT-111 tanker cars derailed and careened into each other, and due to their well-documented design flaws, ruptured and spilled over a million and a half gallons of highly volatile crude oil from the Irving Shipment into the streets, storm sewers, manholes, basements, businesses, and homes adjacent to the tracks.

125. Soon thereafter, the highly volatile crude oil ignited and then exploded, incinerating everyone and everything in the immediate area.

126. On July 6, 2013, Plaintiff's decedent, Henriette Latulippe was present in downtown Lac-Mégantic near the site of the derailment and was amongst the forty-eight victims consumed by the fire and explosions.

### Count I - Wrongful Death-Negligence
### (RAIL WORLD, INC. ---"RAILWORLD")

127. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 126 as if fully set out in this Count I.

128. Defendant RailWorld is a railroad management, consulting and investment corporation, incorporated in Illinois, specializing in privatizations and restructurings.

129. Defendant RailWorld was incorporated by Defendant Edward A. Burkhardt, who serves as the company's current President and Chief Executive Officer.

130. Defendant RailWorld is the parent company of Debtor.

131. Debtor operated the train that derailed in Lac-Mégantic. As parent company of Debtor, Defendant RailWorld dictated and enforced all directives concerning the number of employees required to operate the train, the number and manner in which the hand brakes are to be applied, the decisions to leave the train unattended; and is responsible for the lack of safety and security measures or procedures at Debtor.

132. At all times relevant herein, Defendant RailWorld owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

133. Defendant RailWorld breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.    Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, negligently agreed to transport flammable liquids in DOT-111 tankers that had not been retrofitted to reduce the risk of rupture in the event of derailment.

b.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, negligently transported flammable liquids in DOT-111 tankers that had not been retrofitted to reduce the risks in the event of derailment.

c.      Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of unreinforced DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, failed to establish and enforce adequate safety protocols and train its staff in those protocols.

d.      Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, operated its trains with a single crew member.

e.      Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, failed to train its employees to properly set brakes when trains are left unattended.

f.      Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently trained its employees on the proper safety protocol when an unattended train carrying flammable liquids catches fire.

g.      Despite knowledge of admonitions from the NTSB to replace, retrofit, or limit the use of DOT-111 tanker cars to less volatile cargo, Defendant, and/or

its subsidiaries or its joint ventures, directed or allowed the transport of flammable liquids in unretrofitted DOT-111 tanker cars.

h.     Despite knowledge that the NTSB had identified the use of "unit trains" for the transport of petroleum products as an additional source of risk of harm, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently directed or allowed the transport of flammable liquids in DOT-111 tanker cars on a single-cargo unit train.

i.     Despite awareness of the multiple risk factors inherent in the transport of highly flammable cargo in faulty DOT-111 tanker cars on a high-volume unit train through populated areas, Defendant, and/or its subsidiaries or its joint ventures, directed or allowed shipment through those areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

j.     Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to take notice of dangerous and unsafe operating conditions.

k.     Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to appreciate defects in the track conditions.

l.     Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to appreciate defects in its trains.

m.     Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to operate its trains in a reasonably safe manner.

134. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant RailWorld, Plaintiff's decedent Henriette Latulippe suffered

greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

135. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

136. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

137. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant RW Holdings, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count II - Wrongful Death-Negligence
## (RAIL WORLD HOLDINGS LLC---"RW HOLDINGS")

138. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 137 as if fully set out in this Count II.

139. Defendant RW Holdings is a holding company for other corporate entities and is dominated and controlled by its parent company, Rail World, Inc.

140. Defendant RW Holdings was founded by Edward Burkhardt, President and Chief Executive Officer of Rail World, Inc., who currently serves at its President and Chief Executive Officer.

141. Defendant RW Holdings holds railway investments around the world, including Rail World Poland LLC, Rail World Estonia LLC, Rail World BV, and Rail World Locomotive Leasing LLC.

142. At all times relevant herein, the train that derailed in Lac-Mégantic on July 6, 2013 was operated by Debtor whose parent company was Rail World, Inc., parent company of RW Holdings.

143. At all times relevant herein, Defendant RW Holdings owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

144. Defendant RW Holdings breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.    Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, negligently agreed to transport flammable liquids in DOT-111 tankers that had not been retrofitted to reduce the risk of rupture in the event of derailment.

   b.    Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, negligently transported flammable liquids in DOT-111 tankers that had not been retrofitted to reduce the risks in the event of derailment.

   c.    Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of unreinforced DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, failed to establish and enforce adequate safety protocols and train its staff in those

protocols.

d.      Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, operated its trains with a single crew member.

e.      Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, failed to train its employees to properly set brakes when trains are left unattended.

f.      Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently trained its employees on the proper safety protocol when an unattended train carrying flammable liquids catches fire.

g.      Despite knowledge of admonitions from the NTSB to replace, retrofit, or limit the use of DOT-111 tanker cars to less volatile cargo, Defendant, and/or its subsidiaries or its joint ventures, directed or allowed the transport of flammable liquids in unretrofitted DOT-111 tanker cars.

h.      Despite knowledge that the NTSB had identified the use of "unit trains" for the transport of petroleum products as an additional source of risk of harm, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently directed or allowed the transport of flammable liquids in DOT-111 tanker cars on a single-cargo unit train.

i.      Despite awareness of the multiple risk factors inherent in the transport of

highly flammable cargo in faulty DOT-111 tanker cars on a high-volume unit train through populated areas, Defendant, and/or its subsidiaries or its joint ventures, directed or allowed shipment through those areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

j.       Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to take notice of dangerous and unsafe operating conditions.

k.       Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to appreciate defects in the track conditions.

l.       Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to appreciate defects in its trains.

m.       Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to operate its trains in a reasonably safe manner.

145. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant RW Holdings, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

146. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

147. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

148. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant RW Holdings, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count III - Wrongful Death-Negligence
### (RAIL WORLD LOCOMOTIVE LEASING LLC---"RW LOCOMOTIVE")

149. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 148 as if fully set out in this Count III.

150. Defendant RW Locomotive is company that offers rebuilt and new locomotives on a lease, purchase or finance basis.

151. Defendant RW Locomotive is dominated and controlled by its parent company, Rail World Holdings LLC.

152. Defendant RW Locomotive was founded by Edward A. Burkhardt, President and Chief Executive Officer of RailWorld and RW Holdings, who currently serves at its Chairman and Chief Executive Officer.

153. Upon information and belief, Defendant RW Locomotive supplied tank cars and/or locomotives used during the transport of the train which departed from New Town, North Dakota on or about June 29, 2013.

154. At all times relevant herein, Defendant RW Locomotive owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

155. Defendant RW Locomotive breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.    Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, negligently agreed to transport flammable liquids in DOT-111 tankers that had not been retrofitted to reduce the risk of rupture in the event of derailment.

    b.    Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, negligently transported flammable liquids in DOT-111 tankers that had not been retrofitted to reduce the risks in the event of derailment.

    c.    Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of unreinforced DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, failed to establish and enforce adequate safety protocols and train its staff in those protocols.

    d.    Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, operated its trains with a single crew member.

    e.    Despite its knowledge that it was transporting flammable liquids, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, failed to train its employees to properly set brakes when trains are left unattended.

    f.    Despite its knowledge that it was transporting flammable liquids, and

despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently trained its employees on the proper safety protocol when an unattended train carrying flammable liquids catches fire.

g.      Despite knowledge of admonitions from the NTSB to replace, retrofit, or limit the use of DOT-111 tanker cars to less volatile cargo, Defendant, and/or its subsidiaries or its joint ventures, directed or allowed the transport of flammable liquids in unretrofitted DOT-111 tanker cars.

h.      Despite knowledge that the NTSB had identified the use of "unit trains" for the transport of petroleum products as an additional source of risk of harm, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently directed or allowed the transport of flammable liquids in DOT-111 tanker cars on a single-cargo unit train.

i.      Despite awareness of the multiple risk factors inherent in the transport of highly flammable cargo in faulty DOT-111 tanker cars on a high-volume unit train through populated areas, Defendant, and/or its subsidiaries or its joint ventures, directed or allowed shipment through those areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

j.      Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to take notice of dangerous and unsafe operating conditions.

k.      Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to appreciate defects in the track conditions.

l.      Defendant, and/or its subsidiaries or its joint ventures, carelessly and

negligently failed to appreciate defects in its trains.

m.      Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to operate its trains in a reasonably safe manner.

156. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant RW Locomotive, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

157. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

158. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

159. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant RW Locomotive, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count IV – Wrongful Death – Negligence
### (EDWARD A. BURKHARDT – "Burkhardt")

160. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 159 as if fully set out in this Count IV.

32

161. Defendant Burkhardt is, and was at all times relevant to the events giving rise to this Complaint, the President and Chief Executive Officer of RailWorld, Inc, a rail transport holding corporation and parent company of the Montreal, Maine an Atlantic Railway Inc, ("Debtor") which Burkhardt wholly owns and manages and for which he serves as Chairman of the Board.

162. Upon information and belief, since the time that Defendant Burkhardt formed RailWorld in 1999, he has personally maintained complete control over the management decisions of the company, especially with respect to the business plan that RailWorld implemented at his behest in regard to the operations for Debtor.

163. Defendant Burkhardt knew or had reason to know that his business plan which sacrificed safety for the sake of profits would lead to train accidents.

164. Defendant Burkhardt, as principal director of the RailWorld entities and owner of Debtor, is responsible for the adoption and enforcement of safety policies and the failure to adopt and enforce those policies.

165. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Burkhardt.

166. At all times relevant to this Complaint, Defendant Burkhardt knew or should have known of the history documented for over twenty years by regulators and media of DOT-111 tankers rupturing upon derailment.

167. At all times relevant to the Complaint, Defendant Burkhardt knew or should have known that the United States National Transportation Safety Board ("NTSB") had issued a Safety Recommendation as far back as 1991 warning of the danger of transporting hazardous materials in DOT-111 tank cars.

168. At all times relevant to the Complaint, Defendant Burkhardt knew or should have known that the NTSB had issued a safety recommendation in 2012 urging the mandated retrofitting of all DOT-111 tanker cars with additional safety design features.

169. At all times relevant to the Complaint, Defendant Burkhardt knew or should have known that the NTSB had noted in 2012 that the industry shift toward "unit trains" transporting a single cargo magnified the risk already posed by the transport of highly flammable crude oil in faulty tank cars because it multiplied the quantity of crude oil would spill, ignite, explode and contaminate highly populated areas in the event of a derailment.

170. At all times relevant to this Complaint, Defendant Burkhardt was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than crude oil from other locations.

171. At all times relevant to this Complaint, Defendant Burkhardt knew or should have known that the transport of Bakken crude oil in DOT-111 tanker cars posed a risk that exceeded the risk already inherent in the transport of crude oil from other North American sources because of Bakken crude oil's greater susceptibility to self-ignition and explosion.

172. At all times relevant to the Complaint, Defendant Burkhardt knew or should have known that Debtor was transporting a highly flammable cargo in DOT-111 tanker cars despite industry-wide awareness of the risk and multiple admonitions from the NTSB to retrofit, replace, or limit the use of DOT-111 tanker cars to the transport of less hazardous materials.

173. At all times relevant to the Complaint, Defendant Burkhardt knew or should have known that in July 2013 Debtor was transporting crude oil from the Bakken Formation in DOT-111 tanker cars on a single-cargo "unit train" despite the compounded risks posed by the

combination of 1) high volume transport of 2) a highly flammable material in 3) a faulty tanker cr.

174. At all times relevant to the Complaint, Defendant Burkhardt knew or should have known that Debtor's safety protocols were inadequate to ensure the safe delivery of highly flammable crude oil.

175. At all times relevant to the Complaint, Defendant Burkhardt knew of should have known that staffing a train transporting highly flammable crude oil with only one employee posed a risk of danger of derailment.

176. At all times relevant to the Complaint, Defendant Burkhardt knew or had reason to know that the Debtor was not qualified to safely transport crude oil and that his direction that Debtor's locomotives move DOT-111 tanker cars posed a real and present danger to the people and property located near its tracks.

177. At all times relevant herein, Defendant Burkhardt owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

178. Upon information and belief, Defendant Burkhardt breached his duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a. Despite his awareness of the well-known rupture risk of DOT-111 tank cars, Defendant negligently agreed to transport flammable liquids in DOT-111 tankers that had not been retrofitted to reduce the risks in the event of derailment.

   b. Despite his awareness of the well-known rupture risk of DOT-111 tank cars, Defendant negligently transported flammable liquids in DOT-111 tankers that

had not been retrofitted to reduce the risks in the event of derailment.

c. Despite knowing that flammable liquids were being transported, and despite awareness of the well-known rupture risk of unreinforced DOT-111 tank cars, Defendant failed to establish and enforce adequate safety protocols and direct the training of staff in those protocols.

d. Despite knowing that flammable liquids were being transported, and despite awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed or allowed the operation of trains with a single crew member.

e. Despite knowing that flammable liquids were being transported, and despite awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant failed to train his employees to properly set brakes when trains are left unattended.

f. Despite knowing that flammable liquids were being transported, and despite awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant carelessly and negligently failed to provide for the training of employees on safety protocols when an unattended train carrying flammable liquids catches fire.

g. Despite knowledge of admonitions from the NTSB to replace, retrofit, or limit the use of DOT-111 tanker cars to less volatile cargo, Defendant directed or allowed the transport of flammable liquids in unretrofitted DOT-111 tanker cars.

h. Despite knowledge that the NTSB had identified the use of "unit trains" for the transport of petroleum products as an additional source of risk of harm, Defendant carelessly and negligently directed or allowed the transport of flammable liquids in DOT-111 tanker cars on a single-cargo unit train.

36

      i.  Despite awareness of the multiple risk factors inherent in the transport of highly flammable cargo in faulty DOT-111 tanker cars on a high-volume unit train through populated areas, Defendant directed or allowed shipment through those areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

      j.  Defendant carelessly and negligently failed to take notice of dangerous and unsafe operating conditions.

      k.  Defendant carelessly and negligently failed to appreciate defects in the track conditions.

      l.  Defendant carelessly and negligently failed to appreciate defects in its trains.

      m. Defendant carelessly and negligently failed to operate its trains in a reasonably safe manner.

179. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Burkhardt, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

180. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

181. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

182. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Burkhardt, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count V - Wrongful Death-Negligence
## (CANADIAN PACIFIC RAILWAY COMPANY—"CP-Railway")

183.  The Plaintiff incorporates and alleges general allegation paragraphs 1 through 182 as if fully set out in this Count V.

184.  Defendant CP-Railway is a transportation, logistics, and management company which maintains over 14,000 miles of track extending throughout Canada and into the U.S. industrial centers of Chicago, Newark, Philadelphia, Washington, New York City, and Buffalo.

185.  Defendant CP-Railway transported seventy-two DOT-111 tankers filled with crude oil from New Town, North Dakota to Cote Saint-Luc, before the tankers were transferred to Debtor under whose care they derailed in Lac-Mégantic.

186.  At all times relevant herein, Defendant CP-Railway owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

187.  Defendant CP-Railway breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.      Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures,

Defendant failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.     Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.     Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.     Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

188. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant CP-Railway, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

189. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

190. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

191. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant CP-Railway, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count VI - Wrongful Death-Negligence
### (WORLD FUEL SERVICES CORPORATION—"WORLDFUEL")

192. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 191 as if fully set out in this Count VI.

193. Defendant WorldFuel, directly and through its many subsidiaries and joint ventures, offers comprehensive energy products and services around the globe, including the marketing, sale, and transport of crude oil from the Bakken Formation in North Dakota.

194. At all times relevant to this Complaint, WorldFuel, directly and/or through its subsidiaries, operated a crude oil transloading joint venture with Defendant DakotaHoldings, and/or its subsidiaries, in New Town, North Dakota (the "New Town Transloading Facility").

195. The Irving Shipment of crude oil was transloaded from truck tankers into rail tank cars at the New Town Transloading Facility.

196. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by Defendant WorldFuel, through its control and direction over its subsidiaries and joint ventures.

197. At all times relevant herein, Defendant WorldFuel owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

198. Defendant WorldFuel breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

    b. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

    c. Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures, to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

    d. Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II),

Defendant directed and/or allowed (and/or allowed its subsidiaries and joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e. Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries and joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f. Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries and joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries and joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries and joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

    i. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries and joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

    j. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries and joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

199. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant WorldFuel, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

200. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

201.   The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

202.   The Plaintiff seeks damages in excess of $1,000,000.00.

WHEREFORE, the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant WorldFuel, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count VII – Wrongful Death – Negligence
### (WORLD FUEL SERVICES, INC.)

203.   The Plaintiff incorporates and alleges general allegation paragraphs 1 through 202 as if fully set out in this Count VII.

204.   Defendant World Fuel Services, Inc. is a wholly owned subsidiary of WorldFuel.

205.   The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by WorldFuel, by and through its subsidiaries and joint ventures, including Defendant World Fuel Services, Inc.

206.   At all times relevant herein, Defendant World Fuel Services, Inc. owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

207.   Defendant World Fuel Services, Inc. breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.   Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant

failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

b.        Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.        Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.        Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries, or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group  III).

e.        Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

47

      j.     Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

208. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant World Fuel Services, Inc., Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

209. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

210. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

211. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant World Fuel Services, Inc. for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count VIII – Wrongful Death – Negligence
## (WORLD FUEL SERVICES CANADA, INC.)

212. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 211 as if fully set out in this Count VIII.

213. Defendant World Fuel Services Canada, Inc. is a wholly owned subsidiary of WorldFuel.

214. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by WorldFuel, by and through its subsidiaries and joint ventures, including Defendant World Fuel Services Canada, Inc.

215. At all times relevant herein, Defendant World Fuel Services Canada, Inc. owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

216. Defendant World Fuel Services Canada, Inc. breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

    b.    Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire

50

Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

217. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant World Fuel Services, Inc., Plaintiff's decedent Henriette Latulippe

suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

218. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

219. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

220. The Plaintiff seeks damages in excess of $1,000,000.00.

WHEREFORE, the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant World Fuel Services Canada, Inc., for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count IX – Wrongful Death - Negligence
### (WESTERN PETROLEUM COMPANY – "WesternPetro")

221. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 220 as if fully set out in this Count IX.

222. Defendant WesternPetro is a wholly owned subsidiary of WorldFuel.

223. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by WorldFuel, by and through its subsidiaries and joint ventures, including Defendant WesternPetro.

224. Defendant WesternPetro was the lessee of the DOT-111 tanker cars which transported the Irving Shipment of crude oil.

52

225. Defendant WesternPetro subleased the DOT-111 tanker cars which transported the Irving Shipment to Defendant DPTS.

226. At all times relevant herein, Defendant WesternPetro owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

227. Defendant WesternPetro breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

   b. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

   c. Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d. Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e. Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f. Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or

54

allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

    i.  Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

    j.  Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

228. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant WesternPetro, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured and exploded in Lac-Mégantic on July 6, 2013.

229. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and

society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

230. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

231. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant WesternPetro, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count X – Wrongful Death – Negligence
### (PETROLEUM TRANSPORT SOLUTIONS, LLC – "PetroTransport")

232. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 231 as if fully set out in this Count X.

233. Defendant PetroTransport is a wholly owned subsidiary of WorldFuel.

234. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by WorldFuel, by and through its subsidiaries and joint ventures, including Defendant PetroTransport.

235. At all times relevant to this Complaint, Defendant PetroTransport owned a fifty percent (50%) membership interest in Defendant DPTS and in Defendant DakotaTransport

236. Defendant DPTS and Defendant DakotaTransport were operated by Defendant PetroTransport as joint ventures with wholly owned subsidiaries of Defendant Dakota Holdings.

237. Defendant PetroTransport on behalf of Defendant DPTS purchased crude oil for the Irving Shipment from Bakken Formation Suppliers.

238. Defendant PetroTransport, directly and/or through its subsidiaries, joint ventures, and/or agents, arranged for the transloading of the Irving Shipment into tanker cars which were subleased to Defendant DPTS.

239. Defendant PetroTransport, directly and/or through its subsidiaries, joint ventures, and/or agents, arranged for the transportation and routing of the Irving Shipment with Defendant CP-Railway.

240. At all times relevant herein, Defendant PetroTransport owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

241. Defendant PetroTransport breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

    b.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire

Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

242. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant PetroTransport, Plaintiff's decedent Henriette Latulippe suffered

greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

243. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

244. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

245. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant PetroTransport, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XI - Wrongful Death-Negligence
### (IRVING OIL LIMITED—"IrvingOilLtd")

246. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 245 as if fully set out in this Count XI.

247. Defendant IrvingOilLtd, directly and through its many subsidiaries, joint ventures, and/or agents, offers comprehensive energy products and services around the globe, including the processing, transporting, and marketing of crude oil from the Bakken Formation in North Dakota.

248. At all material times, Defendant IrvingOilLtd either directly or indirectly through an agent, subsidiary or joint venture, purchased and had a proprietary or equitable interest in and

control of the shale liquids, that were in the process of being shipped by MMAR from New Town, North Dakota to Irving Oil's refinery in St. John, New Brunswick on July 6, 2013.

249. Upon information and belief, the shipping documents pertaining to the July 6, 2013 indicated that the shipper was Western Petroleum Company, a subsidiary of World Fuel, and the consignee was IrvingOilLtd.

250. At all times relevant to this Complaint, Defendant IrvingOilLtd was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

251. Defendant IrvingOilLtd directly or indirectly, through an agent, subsidiary or joint venture, was responsible for the decision to use and/or was aware of the use of DOT-111 tankers to ship the crude oil produced from the Bakken Formation.

252. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant IrvingOilLtd.

253. At all times relevant herein, Defendant IrvingOilLtd owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

254. Upon information and belief, Defendant IrvingOilLtd breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant

failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

b.      Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group  III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

255.  As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant IrvingOilLtd, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

256.  By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

257.  The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

258.  The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Irving, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XII - Wrongful Death-Negligence

## (IRVING OIL COMPANY LIMITED—"IrvingOilCo")

259. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 258 as if fully set out in this Count XII.

260. Defendant IrvingOilCo, directly and through its many subsidiaries, joint ventures, and/or agents, offers comprehensive energy products and services around the globe, including the processing, transporting, and marketing of crude oil from the Bakken Formation in North Dakota.

261. At all material times, Defendant Irving either directly or indirectly through an agent, subsidiary or joint venture, purchased and had a proprietary or equitable interest in and control of the shale liquids, that were in the process of being shipped by MMAR from New Town, North Dakota to Irving Oil's refinery in St. John, New Brunswick on July 6, 2013.

262. Upon information and belief, the shipping documents pertaining to the July 6, 2013 indicated that the shipper was Western Petroleum Company, a subsidiary of World Fuel, and the consignee was Irving.

263. At all times relevant to this Complaint, Defendant Irving was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

264. Defendant Irving directly or indirectly, through an agent, subsidiary or joint venture, was responsible for the decision to use and/or was aware of the use of DOT-111 tankers to ship the crude oil produced from the Bakken Formation.

265. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Irving.

266. At all times relevant herein, Defendant Irving owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

267. Upon information and belief, Defendant Irving breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

    b.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

    c.  Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

66

d.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed

(and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

268. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant IrvingOilCo, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

269. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and

society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

270.  The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

271.  The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant IrvingOilCo, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XIII- Wrongful Death-Negligence
### (IRVING OIL OPERATIONS GENERAL PARTNER LIMITED—"IrvingGP")

272.  The Plaintiff incorporates and alleges general allegation paragraphs 1 through 271 as if fully set out in this Count XIII.

273.  Defendant IrvingGP, directly and through its many subsidiaries, joint ventures, and/or agents, offers comprehensive energy products and services around the globe, including the processing, transporting, and marketing of crude oil from the Bakken Formation in North Dakota.

274.  At all material times, Irving either directly or indirectly through an agent, subsidiary or joint venture, purchased and had a proprietary or equitable interest in and control of the shale liquids, that were in the process of being shipped by MMAR from New Town, North Dakota to Irving Oil's refinery in St. John, New Brunswick on July 6, 2013.

275. Upon information and belief, the shipping documents pertaining to the July 6, 2013 indicated that the shipper was Western Petroleum Company, a subsidiary of World Fuel, and the consignee was Irving, parent company of IrvingGP.

276. At all times relevant to this Complaint, Defendant Irving was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

277. Defendant Irving directly or indirectly, through an agent, subsidiary or joint venture, was responsible for the decision to use and/or was aware of the use of DOT-111 tankers to ship the crude oil produced from the Bakken Formation.

278. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Irving.

279. At all times relevant herein, Defendant Irving owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

280. Upon information and belief, IrvingGP breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

b.         Despite its knowledge that crude oil produced from the Bakken
Formation is often explosive and can self-ignite at low ambient temperatures,
Defendant failed to establish, and/or failed to direct that its subsidiaries or
its joint ventures establish, safety protocols to analyze and properly classify
crude oil before it was shipped through densely populated urban areas.

c.         Despite its knowledge that the DOT-111 tank cars carrying the Irving
Shipment of crude oil contained a mixture of crude oil from different suppliers,
Defendant failed to conduct, and/or failed to direct its subsidiaries or joint
ventures to conduct, a proper investigation and analysis of the crude oil cargo,
resulting in the misclassification of the danger posed by its transportation.

d.         Despite its knowledge that the crude oil blended into the Irving
Shipment was delivered to the New Town Transloading Facility designated as
high danger cargo (Packing Group I) and moderate danger cargo (Packing
Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or
joint ventures to direct or allow) the entire Irving Shipment to be transported
designated as low danger cargo (Packing Group  III).

e.         Despite its awareness of the well-known rupture risk of DOT-111 tank
cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint
ventures to direct or allow) the entire Irving Shipment to be transported using
DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.         Despite its knowledge of the well-known rupture risk of the DOT-111
tanker cars, Defendant carelessly and negligently failed to include in their
safety protocols (and/or failed to direct that its subsidiaries or joint

ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.     Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.     Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.     Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed

(and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

281. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant IrvingGP, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

282. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

283. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

284. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Irving, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XIV- Wrongful Death-Negligence
### (IRVING OIL COMMERCIAL G.P.—"IrvingCommercial")

285. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 284 as if fully set out in this Count XIV.

286. Defendant IrvingCommercial, directly and through its many subsidiaries, joint ventures, and/or agents, offers comprehensive energy products and services around the globe, including the processing, transporting, and marketing of crude oil from the Bakken Formation in North Dakota.

287. At all material times, Defendant IrvingCommercial either directly or indirectly through an agent, subsidiary or joint venture, purchased and had a proprietary or equitable interest in and control of the shale liquids, that were in the process of being shipped by MMAR from New Town, North Dakota to Irving Oil's refinery in St. John, New Brunswick on July 6, 2013.

288. Upon information and belief, the shipping documents pertaining to the July 6, 2013 shipment indicated that the shipper was Western Petroleum Company, a subsidiary of World Fuel, and the consignee was Irving.

289. At all times relevant to this Complaint, Defendant Irving was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

290. Defendant Irving directly or indirectly, through an agent, subsidiary or joint venture, was responsible for the decision to use and/or was aware of the use of DOT-111 tankers to ship the crude oil produced from the Bakken Formation.

291. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Irving.

292. At all times relevant herein, Defendant Irving owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and

to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

293. Upon information and belief, Defendant Irving breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

    b. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

    c. Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

    d. Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint

ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.  Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.   Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.   Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

294.  As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant IrvingCommercial, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

295.  By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

296. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

297. The Plaintiff seeks damages in excess of $1,000,000.00.

WHEREFORE, the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant IrvingCommercial, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XV – Wrongful Death – Negligence
## (STROBEL STAROSTKA TRANSFER – "Strobel")

298. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 297 as if fully set out in this Count XV.

299. Defendant Strobel operates transloading facilities in the Bakken Formation.

300. At all times relevant to this Complaint, Defendant Strobel assisted in the operation of the New Town Transloading Facility

301. Defendant Strobel directed or assisted in the direction of the transloading of crude oil of the Irving Shipment onto DOT-111 tank cars for shipment by the CP-Railway.

302. Defendant Strobel arranged or assisted in the arrangement for the transportation of the Irving Shipment by the CP-Railway.

303. At all times relevant herein, Defendant Strobel owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

304. Defendant Strobel, breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

    b.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

    c.  Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

    d.  Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed

(and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

305. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Strobel, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

306. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

307. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

308. The Plaintiff seeks damages in excess of $1,000,000.00.

WHEREFORE, the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Strobel, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XVI - Wrongful Death – Negligence
### (DAKOTA PLAINS MARKETING, LLC – "DakotaMarketing")

309. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 308 as if fully set out in this Count XVI.

310. Defendant DakotaMarketing is a wholly owned subsidiary of DakotaHoldings.

311. Defendant DakotaMarketing, through Defendant DPTS, entered into a joint venture with WorldFuel, and/or it's wholly owned subsidiary, to purchase and market crude oil produced in the Bakken Formation.

312. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by DakotaHoldings, by and through its subsidiaries and joint ventures, including DakotaMarketing.

313. At all times relevant herein, Defendant DakotaMarketing owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

314. DakotaMarketing, breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint

82

ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

b.    Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.    Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or its joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.    Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.    Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

315.  As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant DakotaMarketing, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

316.  By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

317.  The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

318.  The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant DakotaMarketing, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XVII – Wrongful Death – Negligence
### (DAKOTA PLAINS HOLDINGS, INC. -- DakotaHoldings)

319. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 318 as if fully set out in this Count XVII.

320. Defendant DakotaHoldings is an integrated energy company that provides through its subsidiaries, joint ventures, and/or agents crude oil storage, logistics, and rail transportation services.

321. At all times relevant to this Complaint, Defendant DakotaHoldings, directly and/or through its subsidiaries, operated a crude oil transloading joint venture with Defendant WorldFuel, and/or its subsidiaries, in New Town, North Dakota (the "New Town Transloading Facility").

322. At all times relevant to this Complaint, Defendant DakotaHoldings directly, and/or through its subsidiaries, owned a fifty percent (50%) membership interest in Defendant DPTS and in Defendant DakotaTransport

323. The Irving Shipment was transferred into rail tank cars at the New Town Transloading Facility.

324. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by Defendant DakotaHoldings, through its control and direction over its subsidiaries and joint ventures.

325. At all times relevant herein, Defendant DakotaHoldings owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

326. Defendant DakotaHoldings breached its duty to the Plaintiff's decedent Henriette
Latulippe, including but not limited to the following actions and inactions:

a.  Despite its knowledge that crude oil produced from the Bakken Formation
is often explosive and can self-ignite at low ambient temperatures, Defendant
failed to conduct, and/or failed to direct that its subsidiaries or its joint
ventures conduct, a proper investigation and analysis of the Irving Shipment
of crude oil.

b.  Despite its knowledge that crude oil produced from the Bakken
Formation is often explosive and can self-ignite at low ambient temperatures,
Defendant failed to establish, and/or failed to direct that its subsidiaries or
its joint ventures establish, safety protocols to analyze and properly classify
crude oil before it was shipped through densely populated urban areas.

c.  Despite its knowledge that the DOT-111 tank cars carrying the Irving
Shipment of crude oil contained a mixture of crude oil from different suppliers,
Defendant failed to conduct, and/or failed to direct its subsidiaries or its
joint ventures to conduct, a proper investigation and analysis of the crude oil
cargo, resulting in the misclassification of the danger posed by its transportation.

d.  Despite its knowledge that the crude oil blended into the Irving
Shipment was delivered to the New Town Transloading Facility designated as
high danger cargo (Packing Group I) and moderate danger cargo (Packing
Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or
its joint ventures to direct or allow) the entire Irving Shipment to be transported
designated as low danger cargo (Packing Group  III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or its joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known

rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

327. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant DakotaHoldings, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

328. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

329. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

330. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant DakotaHoldings, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XVIII – Wrongful Death – Negligence
## (DPTS MARKETING, LLC – "DPTS")

331. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 330 as if fully set out in this Count XVIII.

332. Defendant DPTS purchases and markets crude oil produced in the Bakken Formation.

333. Defendant DPTS operates as a joint venture formed between Defendant WorldFuel (through its wholly owned subsidiary) and Defendant DakotaHoldings (through its wholly owned subsidiary).

334. Defendant DPTS purchased crude oil for the Irving Shipment from Bakken Formation Suppliers.

335. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by DakotaHoldings, by and through its subsidiaries and joint ventures, including Defendant DPTS.

336. At all times relevant herein, Defendant DPTS owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

337. Defendant DPTS, breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.   Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

b.   Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.   Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or its joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.   Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.   Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported

using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.        Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or its joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor

any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

338. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant DPTS, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

339. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

340. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

341. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the

Defendant DPTS, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XIX – Wrongful Death - Negligence
## (DAKOTA PLAINS TRANSLOADING, LLC – "DakotaTransloading")

342. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 341 as if fully set out in this Count XIX.

343. Defendant DakotaTransloading is a wholly owned subsidiary of Defendant DakotaHoldings.

344. Defendant DakotaTransloading, through Defendant DakotaTransport, entered into a joint venture with WorldFuel, and/or its wholly owned subsidiary, to transload crude oil produced in the Bakken Formation from truck tanker cars onto rail tanker cars.

345. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by DakotaHoldings, by and through its subsidiaries and joint ventures, including Defendant DakotaTransport.

346. At all times relevant herein, Defendant DakotaTransloading owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

347. Defendant DakotaTransloading, breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

      a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint

94

ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

b.        Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.        Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or its joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.        Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group  III).

e.        Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or its joint ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

96

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

348. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant DakotaTransloading, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

349. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

350. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

351. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant DakotaTransloading, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

**Count XX – Wrongful Death – Negligence**

**(DAKOTA PETROLEUM TRANSPORT SOLUTIONS, LLC – "DakotaTransport")**

352. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 351 as if fully set out in this Count XX.

353. Defendant DakotaTransport purchases, sells, stores, transports, and markets crude oil produced in the Bakken Formation.

354. Defendant DakotaTransport operates as a joint venture formed between Defendant WorldFuel (through its wholly owned subsidiary) and Defendant DakotaHoldings (through its wholly owned subsidiary).

355. The sale, transport, and classification of the crude oil included in the Irving Shipment were directed and coordinated in part by DakotaHoldings, by and through its subsidiaries and joint ventures, including Defendant DakotaTransport.

356. At all times relevant herein, Defendant DakotaTransport owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

357. Defendant DakotaTransport, breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

b.      Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

c.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct, and/or failed to direct its subsidiaries or its joint ventures to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries or joint

ventures include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed

100

(and/or allowed its subsidiaries or its joint ventures to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

358. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant DakotaTransport, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

359. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

360. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

361. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant DakotaTransport, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XXI – Wrongful Death – Negligence
### (SMBC RAIL SERVICES LLC – "SMBC")

362. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 361 as if fully set out in this Count XXI.

363. Defendant SMBC is in the business of leasing rail cars, including tanker cars utilized to transport crude oil.

364. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were well-known to Defendant SMBC.

365. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased by Defendant SMBC, and placed into the stream of commerce by SMBC.

366. Defendant SMBC was well aware that the DOT-111 tanker cars that they placed in the stream of commerce were being used for the transport of hazardous flammable materials and that the design defects of the DOT-111 tanker cars posed a serious threat of catastrophic injury to the general public in the event of a derailment.

367. Defendant SMBC was well aware that for over thirty years the NTSB has criticized the use of DOT-111 tanker cars for the transport of hazardous flammable materials due to the threat of catastrophic injury they posed to the general public in the event of a derailment.

368. Defendant SMBC was aware or should have been aware that the lessees of its DOT-111 tanker cars were not implementing sufficient safety protocols to minimize the risk of catastrophic consequences of a derailment in densely populated urban areas.

369. At all times relevant herein, Defendant SMBC owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

370. Upon information and belief, Defendant SMBC breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.          Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.          Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.          Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.          Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.          Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.          Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known

rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

371. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant SMBC, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

372. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and

society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

373. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

374. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant SMBC, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXII - Wrongful Death-Negligence
## (UNION TANK CAR COMPANY—"UTCC")

375. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 374 as if fully set out in this Count XXII.

376. Defendant UTCC provides railcar leasing services. UTCC, along with its affiliates, holds itself out as the largest tank car lessor in North America.

377. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant UTCC, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by UTCC.

378. Defendant UTCC, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

379. At all times relevant herein, Defendant UTCC owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

380. Upon information and belief, Defendant UTCC breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.    Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures,  failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

    b.    Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

    c.    Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group  III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

    d.    Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the

Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures,  transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures,  transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known

rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

381. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant UTCC, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

382. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

383. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

384. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant UTCC, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXIII - Wrongful Death-Negligence
## (THE UTLX INTERNATIONAL DIVISION OF UTCC—"UTLX")

385. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 384 as if fully set out in this Count XXIII.

386. Defendant UTCC provides railcar leasing services. UTCC, along with its affiliates, holds itself out as the largest tank car lessor in North America.

387. UTLX is a wholly owned subsidiary of UTCC.

388. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant UTCC, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by UTCC.

389. Defendant UTCC, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

390. At all times relevant herein, Defendant UTLX owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

391. Upon information and belief, Defendant UTLX breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.       Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures,

Defendant, and/or its subsidiaries or its joint ventures,  failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group  III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of  the  well-known

rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.    Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.    Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.    Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

392. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant UTLX, Plaintiff's decedent Henriette Latulippe suffered greatly

and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

393. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

394. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

395. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant UTLX, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXIV - Wrongful Death-Negligence
## (THE MARMON GROUP LLC—"Marmon")

396. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 395 as if fully set out in this Count XXIV.

397. Defendant Marmon is the parent company of UTCC.

398. UTCC provides railcar leasing services. UTCC, along with its affiliates, holds itself out as the largest tank car lessor in North America.

399. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant Marmon, directly or

through its subsidiaries including UTCC, to Western Petro, and placed into the stream of commerce by Marmon.

400. Defendant Marmon, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

401. At all times relevant herein, Defendant Marmon owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

402. Upon information and belief, Defendant Marmon breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.    Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

    b.    Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

    c.    Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger

cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

114

h. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

403. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Marmon, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

404. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

405. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

406. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Marmon, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XXV - Wrongful Death-Negligence
### (PROCOR LIMITED—"PROCOR")

407. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 406 as if fully set out in this Count XXV.

408. Defendant Procor is the Canadian affiliate of UTCC. Together, these companies provide railcar leasing services. Together, Procor and UTCC are the largest tank car lessor in North America.

409. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant UTCC, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by UTCC.

410. Defendant UTCC, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

411. At all times relevant herein, Defendant Procor owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

412. Upon information and belief, Defendant Procor breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.       Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.       Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.       Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.       Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.       Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and

negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the

communities involved as to the catastrophic damage that would result if there was a derailment.

413. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Procor, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

414. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

415. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

416. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Procor, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XXVI - Wrongful Death-Negligence
### (FIRST UNION RAIL CORPORATION—"FIRSTUNION")

417. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 416 as if fully set out in this Count XXVI.

418. Defendant FirstUnion provides railcar leasing services as well as marketing and transportation management services.

119

419. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant FirstUnion, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by FirstUnion.

420. Defendant FirstUnion, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

421. At all times relevant herein, Defendant FirstUnion owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

422. Upon information and belief, Defendant FirstUnion breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.     Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

   b.     Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.        Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.        Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.        Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known

rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

    i.    Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

423. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant FirstUnion, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

424. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

425. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

426. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the

Defendant FirstUnion, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXVII - Wrongful Death-Strict Liability
## (GENERAL ELECTRIC RAILCAR SERVICES CORPORATION—"GE RAIL")

427. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 426 as if fully set out in this Count XXVII.

428. GE Rail is in the business of leasing rail cars, including tanker cars utilized to transport crude oil, as well as service and repair.

429. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant GE Rail to Western Petro, and placed into the stream of commerce by GE Rail.

430. Defendant GE Rail was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

431. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were well-known to Defendant GE Rail.

432. Defendant GE Rail was well aware that the DOT-111 tanker cars that they placed in the stream of commerce were being used for the transport of hazardous flammable materials and that the design defects of the DOT-111 tanker cars posed a serious threat of catastrophic injury to the general public in the event of a derailment.

433. Defendant GE Rail was well aware that for over thirty years the NTSB has criticized the use of DOT-111 tanker cars for the transport of hazardous flammable materials due to the threat of catastrophic injury they posed to the general public in the event of a derailment.

434. Defendant GE Rail was aware or should have been aware that the lessees of its DOT-111 tanker cars were not implementing sufficient safety protocols to minimize the risk of catastrophic consequences of a derailment in densely populated urban areas.

435. At all times relevant herein, Defendant GE Rail owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

436. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant GE Rail, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

437. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

438. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

439. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant GE Rail, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXVIII - Wrongful Death-Negligence

## (GENERAL ELECTRIC RAILCAR SERVICES CORPORATION—"GE RAIL")

440. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 439 as if fully set out in this Count XXVIII.

441. Defendant GE Rail is in the business of leasing rail cars, including tanker cars utilized to transport crude oil.

442. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant GE Rail to Western Petro, and placed into the stream of commerce by GE Rail.

443. Defendant GE Rail was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

444. At all times relevant herein, Defendant GE Rail owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

445. Upon information and belief, Defendant GE Rail breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.      Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving

126

Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.    Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.    Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

446. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant GE Rail, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

447. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

448. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

449. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant GE Rail, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XXIX - Wrongful Death-Negligence
### (GENERAL ELECTRIC COMPANY—"GE")

450. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 449 as if fully set out in this Count XXIX.

451. Defendant GE is a multinational conglomerate corporation operating through several divisions including GE Capital and GE Transportation.

452. Upon information and belief, GE Rail is a business unit of GE Capital.

453. Upon information and belief, through GE Rail and GE Transportation, GE manufactures equipment for the railroad and is the largest producer of diesel-electric locomotives.

454. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant GE, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by GE.

455. Defendant GE, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

456. At all times relevant herein, Defendant GE owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to

take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

457. Upon information and belief, Defendant GE breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

  a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

  b.  Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

  c.  Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

  d.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed

through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

458. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant GE, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

459. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

460. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

461. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant GE, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXX - Wrongful Death-Strict Liability
## (GENERAL ELECTRIC COMPANY—"GE")

462. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 461 as if fully set out in this Count XXX.

463. Defendant GE is a multinational conglomerate corporation operating through several divisions including GE Capital and GE Transportation.

464. Upon information and belief, GE Rail is a business unit of GE Capital.

465. Upon information and belief, through GE Rail and GE Transportation, Defendant GE manufactures equipment for the railroad and is the largest producer of diesel-electric locomotives.

466. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant GE, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by GE.

467. GE, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

468. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant GE Rail to Western Petro, and placed into the stream of commerce by GE Rail.

469. GE Rail was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

470. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were well-known to Defendant GE Rail.

471. Defendant GE Rail was well aware that the DOT-111 tanker cars that they placed in the stream of commerce were being used for the transport of hazardous flammable materials

and that the design defects of the DOT-111 tanker cars posed a serious threat of catastrophic injury to the general public in the event of a derailment.

472. Defendant GE Rail was well aware that for over thirty years the NTSB has criticized the use of DOT-111 tanker cars for the transport of hazardous flammable materials due to the threat of catastrophic injury they posed to the general public in the event of a derailment.

473. Defendant GE Rail was aware or should have been aware that the lessees of its DOT-111 tanker cars were not implementing sufficient safety protocols to minimize the risk of catastrophic consequences of a derailment in densely populated urban areas.

474. At all times relevant herein, Defendant GE Rail owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

475. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant GE, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

476. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

477. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

478. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant GE Rail, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXI - Wrongful Death-Negligence
## (TRINITY INDUSTRIES, INC.—"Trinity")

479. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 478 as if fully set out in this Count XXXI.

480. Upon information and belief, Defendant Trinity engages in the railcar manufacturing and leasing service industries.

481. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant Trinity, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by Trinity.

482. Defendant Trinity, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

483. At all times relevant herein, Defendant Trinity owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

484. Upon information and belief, Defendant Trinity breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b. Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c. Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d. Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e. Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i. Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

136

485.  As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Trinity, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

486.  By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

487.  The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

488.  The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Trinity, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXII - Wrongful Death-Strict Liability
## (TRINITY INDUSTRIES INC—"TRINITY")

489.  The Plaintiff incorporates and alleges general allegation paragraphs 1 through 488 as if fully set out in this Count XXXII.

490.  Upon information and belief, Defendant Trinity engages in the railcar manufacturing and leasing service industries.

491.  Defendant Trinity, directly or through its subsidiaries, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision

to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

492. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were well-known to Defendant Trinity.

493. Defendant Trinity was well aware that the DOT-111 tanker cars that they placed in the stream of commerce were being used for the transport of hazardous flammable materials and that the design defects of the DOT-111 tanker cars posed a serious threat of catastrophic injury to the general public in the event of a derailment.

494. Defendant Trinity was well aware that for over thirty years the NTSB has criticized the use of DOT-111 tanker cars for the transport of hazardous flammable materials due to the threat of catastrophic injury they posed to the general public in the event of a derailment.

495. Defendant Trinity was aware or should have been aware that the lessees of its DOT-111 tanker cars were not implementing sufficient safety protocols to minimize the risk of catastrophic consequences of a derailment in densely populated urban areas.

496. At all times relevant herein, Defendant Trinity owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

497. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Trinity, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

498. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

499. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

500. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Trinity, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXIII - Wrongful Death-Negligence
### (TRINITY INDUSTRIES LEASING COMPANY—"TRINITYINDUSTRIES")

501. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 500 as if fully set out in this Count XXXIII.

502. Upon information and belief, Defendant TrinityIndustries engages in the railcar leasing and management service industries.

503. Upon information and belief, Defendant TrinityIndustries is a wholly owned subsidiary of Defendant Trinity.

504. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant TrinityIndustries,

directly or through its subsidiaries or parent company, to Western Petro, and placed into the stream of commerce by TrinityIndustries.

505. Defendant TrinityIndustries, directly or through its subsidiaries or parent company, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

506. At all times relevant herein, Defendant TrinityIndustries owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

507. Upon information and belief, Defendant TrinityIndustries breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.      Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger

cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.       Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.       Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

508. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant TrinityIndustries, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

509. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

510. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

511. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant TrinityIndustries, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXIV - Wrongful Death-Negligence
## (TRINITY TANK CAR, INC.—"TRINITYTANK")

512. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 511 as if fully set out in this Count XXXIV.

513. Defendant Trinity Tank is in the business of manufacturing rail cars, including tanker cars utilized to transport crude oil.

514. Upon information and belief, Defendant TrinityTank is a wholly owned subsidiary of TrinityIndustries.

515. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant TrinityTank, directly or through its subsidiaries or parent company, to Western Petro, and placed into the stream of commerce by Defendant TrinityTank.

516. Defendant TrinityTank, directly or through its subsidiaries or parent company, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

517. At all times relevant herein, Defendant TrinityTank owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe

manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

518. Upon information and belief, Defendant TrinityTank breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.      Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.      Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the

Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known

rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

519. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant TrinityTank, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

520. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

521. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

522. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant TrinityTank, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXV - Wrongful Death-Negligence
## (TRINITY RAIL LEASING 2012 LLC—"TRL-2012")

523. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 522 as if fully set out in this Count XXXV.

524. Defendant TRL-2012 is an entity providing long-term financing of railcars and is a wholly owned subsidiary of RIV 2013 Rail Holdings LLC, a joint venture controlled in part by TrinityIndustries.

525. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied by Defendant TrinityIndustries, directly or through its subsidiaries, to Western Petro, and placed into the stream of commerce by TrinityIndustries.

526. Defendant TrinityIndustries, directly or through its subsidiaries including TRL-2012, was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

527. At all times relevant herein, Defendant TRL-2012 owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

528. Upon information and belief, Defendant TRL-2012 breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.    Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures,

Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

b.        Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

c.        Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.        Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.        Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.        Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known

rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.　　Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.　　Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.　　Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

529. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant TRL-2012, Plaintiff's decedent Henriette Latulippe suffered

greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

530. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

531. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

532. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant TRL-2012, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXVI - Wrongful Death-Negligence
## (TRINITY RAIL GROUP LLC—"TRINITYRAIL")

533. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 532 as if fully set out in this Count XXXVI.

534. Defendant TrinityRail is a wholly owned subsidiary of Defendant TrinityIndustries.

535. Upon information and belief, several of the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013 were leased/supplied and placed into the stream of commerce by Defendant TrinityIndustries, directly or through its subsidiaries including TrinityRail.

536. At all times relevant herein, Defendant TrinityRail owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

537. Upon information and belief, Defendant TrinityRail, breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Irving Shipment of crude oil.

   b.  Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant, and/or its subsidiaries or its joint ventures, failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly classify crude oil before it was shipped through densely populated urban areas.

   c.  Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant, and/or its subsidiaries or its joint ventures, failed to conduct, and/or failed to direct its subsidiaries, joint ventures, and/or agents to conduct, a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

d.      Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to the New Town Transloading Facility designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the entire Irving Shipment to be transported designated as low danger cargo (Packing Group III).

e.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the entire Irving Shipment to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.      Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant, and/or its subsidiaries or its joint ventures, carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of the Irving Shipment.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company with a poor safety record.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the entire Irving Shipment to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the entire Irving Shipment to be transferred to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

j.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant, and/or its subsidiaries or its joint ventures, directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

538. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant TrinityRail, Plaintiff's decedent Henriette Latulippe suffered

153

greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

539. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

540. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

541. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant TrinityRail, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXVII - Wrongful Death-Negligence
## (INCORR ENERGY GROUP LLC—"Incorr")

542. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 541 as if fully set out in this Count XXXVII.

543. Defendant Incorr is a crude oil marketing, transportation, and trading company which operates in the Inland Corridor of North America.

544. Upon information and belief, Defendant Incorr was either responsible for or aware of the decision to use the tankers to ship the Shale Liquids on the train and of the decision to

transport the tankers along inadequate and deficient railways operated by Rail World through its subsidiaries.

545. At all times relevant herein, Defendant Incorr owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

546. Upon information and belief, Incorr breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

 a. Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

 b. Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

 c. Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed the entire Irving Shipment to be transported designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

 d. Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant transported the Irving Shipment using DOT-111 tank cars,

which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.       Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas

without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

547. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Incorr, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

548. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

549. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

550. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Incorr, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XXXVIII - Wrongful Death-Negligence
### (ENSERCO ENERGY, LLC—"Enserco")

551. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 550 as if fully set out in this Count XXXVIII.

552. Upon information and belief, Defendant Enserco is a crude oil and natural gas marketing company, which also provides producer services such as natural gas scheduling,

transportation and operations management, loan services, exploration efforts and development.

553. Upon information and belief, Defendant Enserco engaged in building and/or operating a crude oil transloading terminal serving producers in the Bakken shale formation as well as from Canada in New Town, North Dakota.

554. At all times relevant herein, Defendant Enserco owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

555. Upon information and belief, Enserco breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

　　　　a.　　　Despite its knowledge that crude oil produced from the Bakken Formation is often explosive and can self-ignite at low ambient temperatures, Defendant failed to conduct a proper investigation and analysis of the Irving Shipment of crude oil.

　　　　b.　　　Despite its knowledge that the DOT-111 tank cars carrying the Irving Shipment of crude oil contained a mixture of crude oil from different suppliers, Defendant failed to conduct a proper investigation and analysis of the crude oil cargo, resulting in the misclassification of the danger posed by its transportation.

　　　　c.　　　Despite its knowledge that the crude oil blended into the Irving Shipment was delivered to New Town, North Dakota designated as high danger cargo (Packing Group I) and moderate danger cargo (Packing Group II), Defendant directed and/or allowed the entire Irving Shipment to be transported

designated as Packing Group III cargo, indicating a high flash point and initial boiling point and, hence, a low danger.

d.      Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant transported the Irving Shipment using DOT-111 tank cars, which had not been retrofitted to reduce the risk of rupture in the event of a derailment.

e.      Despite its knowledge of the rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery.

f.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company with a poor safety record.

g.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor, a railway company which operated its trains with a single crew member.

h.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant transferred the Irving Shipment to the Debtor without providing the Debtor any warning that the Irving Shipment had been mislabeled and was in fact highly volatile.

       i.      Despite its awareness that the Irving Shipment was misclassified as a Class III low volatility material, and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed the entire Irving Shipment to be routed through densely populated urban areas without providing any warning to the communities involved as to the catastrophic damage that would result if there was a derailment.

556. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Enserco, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

557. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

558. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

559. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Enserco, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XXXIX - Wrongful Death-Negligence
### (CONOCOPHILLIPS COMPANY—"ConocoPhillips")

560. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 559 as if fully set out in this Count XXXIX.

561. Defendant ConocoPhillips is engaged in the exploration and production crude oil from regions throughout North America including the Bakken Formation.

562. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant ConocoPhillips is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

563. Upon information and belief, Defendant ConocoPhillips, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

564. At all times relevant herein, Defendant ConocoPhillips owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

565. Defendant ConocoPhillips breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate

162

danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d. Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e. Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f. Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

566. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant ConocoPhillips, Plaintiff's decedent Henriette Latulippe suffered

greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

567.  By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

568.  The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

569.  The Plaintiff seeks damages in excess of $1,000,000.00.

WHEREFORE, the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant ConocoPhillips, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XL - Wrongful Death-Negligence
## (SHELL OIL COMPANY—"SHELL")

570.  The Plaintiff incorporates and alleges general allegation paragraphs 1 through 569 as if fully set out in this Count XL.

571.  Upon information and belief, Defendant Shell is engaged in the exploration, extraction and production of crude oil from regions throughout North America including the Bakken Formation.

572.  As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Shell is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous

materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

573. Upon information and belief, Defendant Shell, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

574. At all times relevant herein, Defendant Shell owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

575. Defendant Shell breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

    b. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other

North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.   Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.   Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to

167

be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.   Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint

ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

576. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Shell, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

577. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

578. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

579. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Shell, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XLI - Wrongful Death-Negligence
## (SHELL TRADING (US) COMPANY—"ShellTrading")

580. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 579 as if fully set out in this Count XLI.

581. Defendant ShellTrading buys and sells crude oil and is one of the largest petroleum supply organization in the United States and the world.

582. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant ShellTrading is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

583. Upon information and belief, Defendant ShellTrading, either directly or indirectly through an agent, subsidiary, or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

584. At all times relevant herein, Defendant ShellTrading owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe

manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

585. Defendant ShellTrading breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

    b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

    c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of

Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars,

Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any

173

warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

586. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant ShellTrading, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

587. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

588. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

589. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant ShellTrading, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XLII – Wrongful Death – Negligence
### (DEVLAR ENERGY MARKETING – "Devlar")

590. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 589 as if fully set out in this Count XLII.

591. Defendant Devlar is in the business of purchasing, selling, and transporting crude oil gathered from resource basins throughout North Dakota, Montana, Wyoming and

Colorado; acting as the marketing arm for natural gas producers; and working with producers to evaluate options for bringing their gas and oil to the market.

592. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Devlar is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

593. Upon information and belief, Defendant Devlar, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

594. At all times relevant to this Complaint, Defendant Devlar was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than crude oil from other locations.

595. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Devlar.

596. At all times relevant herein, Defendant Devlar owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

597. Upon information and belief, Defendant Devlar breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

    b. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

    c. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by

failing to indicate a Packing Group; 3) by mislabeling the shipment as
"Packing Group III" (low danger) or "Packing Group II" (moderate
danger); or 4) by labeling the shipment as "Packing Group I" but failing
specify a safety protocol for the transport of Bakken crude oil.

d.   Despite its knowledge that DOT-111 tank cars are routinely used to transport
crude oil, Defendant failed to specify, and/or failed to direct its
subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank
cars are unsafe for the transport of "Bakken Crude" because of its unique risk of
self-ignition and explosion.

e.   Despite its awareness of the well-known rupture risk of DOT-111 tank cars,
Defendant directed and/or allowed (and/or allowed its subsidiaries, joint
ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to
be transported using DOT-111 tank cars, which were prone to rupture in the
event of a derailment.

f.   Despite its knowledge of the well-known rupture risk of the DOT-111 tanker
cars, Defendant carelessly and negligently failed to include in their safety
protocols (and/or failed to direct that its subsidiaries, joint ventures,
and/or agents include in their safety protocols) the review of the safety
record of all carriers involved in the transport of Bakken crude oil.

g.   Despite its awareness that Bakken crude oil presents a higher risk of self-
ignition and explosion than crude oil from other sources and despite its
awareness of the well-known rupture risk of the DOT-111 tank cars,
Defendant directed and/or allowed (and/or allowed its subsidiaries, joint

ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

598. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Devlar, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

599. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

600. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

601. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Devlar, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XLIII – Wrongful Death – Negligence
## (LARIO OIL & GAS COMPANY – "Lario")

602. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 601 as if fully set out in this Count XLIII.

603. Defendant Lario is a private oil and gas company with operations throughout the United States, including operations in the Williston Basin; and, upon information and belief, is a parent company to Defendant Devlar.

604. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Lario is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

605. Upon information and belief, Defendant Lario, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

606. At all times relevant to this Complaint, Defendant Lario was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

607. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Lario.

608. At all times relevant herein, Defendant Lario owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

609. Upon information and belief, Defendant Lario breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate

danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.   Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

610. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Lario, Plaintiff's decedent Henriette Latulippe suffered greatly and

burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

611. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

612. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

613. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Lario, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XLIV – Wrongful Death – Negligence
### (DEVO TRADING & CONSULTING COMPANY ("Devo")

614. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 613 as if fully set out in this Count XLIV.

615. Upon information and belief, Defendant Devo is a parent company to Defendant Devlar.

616. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Devo is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a

hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

617. Upon information and belief, Defendant Devo, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

618. At all times relevant to this Complaint, Defendant Devo was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

619. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Devo.

620. At all times relevant herein, Defendant Devo owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

621. Upon information and belief, Devo breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its

subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d. Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its

186

subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e. Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f. Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken

crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

622. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Devo, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

623. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and

society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

624. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

625. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Devo, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XLV – Wrongful Death – Negligence
### (OASIS PETROLEUM INC – "Oasis Inc.")

626. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 625 as if fully set out in this Count XLV.

627. Defendant Oasis Inc. is an exploration and production company that acquires and develops unconventional oil and natural gas resources with operations in the Williston Basin, a site of the Bakken Formation.

628. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Oasis Inc. is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

629. Upon information and belief, Defendant Oasis Inc., either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied or acted crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

630. At all times relevant to this Complaint, Defendant Oasis Inc. was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

631. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Oasis Inc.

632. At all times relevant herein, Defendant Oasis Inc. owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

633. Upon information and belief, Defendant Oasis Inc. breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and

analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank

cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken

crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

634. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Oasis Inc., Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

635. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and

society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

636. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

637. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Oasis Inc., for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XLVI – Wrongful Death – Negligence
### (OASIS PETROLEUM LLC – "Oasis LLC")

638. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 637 as if fully set out in this Count XLVI.

639. Upon information and belief, Defendant Oasis LLC is a subsidiary of Defendant Oasis Inc.

640. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Oasis LLC is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

641. Upon information and belief, Defendant Oasis LLC., either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied or acted crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving

Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

642. At all times relevant herein, Defendant Oasis LLC owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

643. Upon information and belief, Defendant Oasis LLC breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

   b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures,

196

and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and

despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

644. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Oasis LLC, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

645. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

646. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

647. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Oasis LLC, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XLII – Wrongful Death – Negligence
## (INLAND OIL & GAS CORPORATION – "Inland")

648. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 647 as if fully set out in this Count XLII.

649. Defendant Inland, a land brokerage company providing energy services, maintains leaseholds in the Williston Basis.

650. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Inland is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

651. Upon information and belief, Defendant Inland, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

652. At all times relevant to this Complaint, Defendant Inland was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

653. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Inland.

654. At all times relevant herein, Defendant Inland owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

655. Upon information and belief, Defendant Inland breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct

that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d. Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e. Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f. Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint

ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

656. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Inland, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

657. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

658. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

659. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Inland, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count XLVIII – Wrongful Death – Negligence
### (WHITING PETROLEUM CORPORATION – "Whiting")

660. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 659 as if fully set out in this Count XLVIII.

661. Defendant Whiting, an independent exploration and production company with an oil-focused asset base, controls one of the largest acreage positions in the Bakken/Three Forks resource play in the Williston Basin of North Dakota and is a top oil producer across the Williston Basin.

662. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Whiting is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

663. Upon information and belief, Defendant Whiting, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

664. At all times relevant to this Complaint, Defendant Whiting was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

665. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Whiting.

666. At all times relevant herein, Defendant Whiting owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe

manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

667. Upon information and belief, Defendant Whiting breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

    b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

    c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and

transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its

206

awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any

warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

668. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Whiting, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

669. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

670. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

671. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Whiting, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count XLIX– Wrongful Death – Negligence
### (ENERPLUS RESOURCES (USA) CORPORATION – "Enerplus")

672. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 671 as if fully set out in this Count XLIX.

673. Defendant Enerplus is an energy producer of oil and gas assets that acquires and develops unconventional oil and natural gas resources with operations in the Williston Basin.

674. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Enerplus is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

675. Upon information and belief, Defendant Enerplus, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

676. At all times relevant to this Complaint, Defendant Enerplus was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

677. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Enerplus

678. At all times relevant herein, Defendant Enerplus owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

679. Upon information and belief, Defendant Enerplus breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by

210

failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint

ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

212

680. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Enerplus, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

681. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

682. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

683. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Enerplus, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count L – Wrongful Death – Negligence
### (HALCON RESOURCES CORPORATION – "Halcon")

684. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 683 as if fully set out in this Count L.

685. Defendant Halcon is an is an independent energy company focused on the acquisition, production, exploration, and development of onshore liquids-rich assets in the United States, owning leasehold interests in North Dakota prospective for the Bakken and Three Forks Formation.

686. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Halcon is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

687. Upon information and belief, Defendant Halcon, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

688. At all times relevant to this Complaint, Defendant Halcon was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

689. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Halcon.

690. At all times relevant herein, Defendant Halcon owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

691. Upon information and belief, Defendant Halcon breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by

215

failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint

216

ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

692. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Halcon, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

693. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

694. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

695. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Halcon, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count LI – Wrongful Death – Negligence
### (TRACKER RESOURCES – "Tracker")

696. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 695 as if fully set out in this Count LI.

697. Defendant Tracker is a private company focusing on oil and gas projects in Texas, the Midwest, and the Rocky Mountain Region, namely the Williston Basin/Bakken.

698. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Tracker is responsible for determining the hazard class of

hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

699. Upon information and belief, Defendant Tracker, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied or acted in joint venture with a supplier of crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

700. At all times relevant to this Complaint, Defendant Tracker was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

701. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Tracker.

702. At all times relevant herein, Defendant Tracker owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

703. Upon information and belief, Defendant Tracker breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate

220

danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.   Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.   Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.   Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

221

h. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j. Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

704. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Tracker, Plaintiff's decedent Henriette Latulippe suffered greatly

and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

705. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

706. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

707. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Tracker, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count LII – Wrongful Death – Negligence

### (KODIAK OIL & GAS CORPORATION (now known as WHITING CANADIAN HOLDING COMPANY, ULC) – "Kodiak")

708. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 707 as if fully set out in this Count LII.

709. Defendant Kodiak was acquired by Whiting Canadian Holding Company in December 2014.

710. Prior to the 2014 acquisition by Whiting, Defendant Kodiak operated as  an independent energy exploration and development company focused on exploring, developing, and

producing oil and natural gas primarily in the Williston Basin, including prime acreage in the Bakken formation.

711. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Kodiak is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

712. Upon information and belief, Defendant Kodiak, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

713. At all times relevant to this Complaint, Defendant Kodiak was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

714. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Kodiak.

715. At all times relevant herein, Defendant Kodiak owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

716. Upon information and belief, Defendant Kodiak breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

   a.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

   b.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

   c.   Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by

failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint

ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

227

717. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Kodiak, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

718. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

719. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

720. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Kodiak, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count LIII – Wrongful Death – Negligence
### (GOLDEN EYE RESOURCES LLC – "Golden Eye")

721. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 720 as if fully set out in this Count LIII.

722. Defendant Golden Eye is an oil and gas exploration and production company active in oil and gas development in the Williston Basin.

723. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Golden Eye is responsible for determining the hazard class of

hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

724. Upon information and belief, Defendant Golden Eye, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

725. At all times relevant to this Complaint, Defendant Golden Eye was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

726. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Golden Eye.

727. At all times relevant herein, Defendant Golden Eye owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

728. Upon information and belief, Defendant Golden Eye breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate

danger); or 4) by labeling the shipment as "Packing Group I" but failing
specify a safety protocol for the transport of Bakken crude oil.

d.   Despite its knowledge that DOT-111 tank cars are routinely used to transport
crude oil, Defendant failed to specify, and/or failed to direct its
subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank
cars are unsafe for the transport of "Bakken Crude" because of its unique risk of
self-ignition and explosion.

e.   Despite its awareness of the well-known rupture risk of DOT-111 tank cars,
Defendant directed and/or allowed (and/or allowed its subsidiaries, joint
ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to
be transported using DOT-111 tank cars, which were prone to rupture in the
event of a derailment.

f.   Despite its knowledge of the well-known rupture risk of the DOT-111 tanker
cars, Defendant carelessly and negligently failed to include in their safety
protocols (and/or failed to direct that its subsidiaries, joint ventures,
and/or agents include in their safety protocols) the review of the safety
record of all carriers involved in the transport of Bakken crude oil.

g.   Despite its awareness that Bakken crude oil presents a higher risk of self-
ignition and explosion than crude oil from other sources and despite its
awareness of the well-known rupture risk of the DOT-111 tank cars,
Defendant directed and/or allowed (and/or allowed its subsidiaries, joint
ventures, and/or agents to direct or allow) shipments containing Bakken crude
oil to be transferred to the Debtor, a railway company with a poor safety record.

231

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

729. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Golden Eye, Plaintiff's decedent Henriette Latulippe suffered

greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

730. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow, and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

731. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

732. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Golden Eye, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count LIV – Wrongful Death – Negligence
## (ARROW MIDSTREAM HOLDINGS LLC – "Arrow")

733. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 732 as if fully set out in this Count LIV.

734. Defendant Arrow is a full-service energy company with a focus in the Williston Basin, engaged in the exploitation and development of crude oil and natural gas, with expertise in gathering, processing, transporting, and marketing of crude oil, natural gas and natural gas liquids.

735. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Arrow is responsible for determining the hazard class of

hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

736. Upon information and belief, Defendant Arrow, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied or acted crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

737. At all times relevant to this Complaint, Defendant Arrow was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

738. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Arrow.

739. At all times relevant herein, Defendant Arrow owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

740. Upon information and belief, Defendant Arrow breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other

North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank

236

cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

741. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Arrow, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

742. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

743. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

744. The Plaintiff seeks damages in excess of $1,000,000.00.

   **WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Arrow, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count LV – Wrongful Death – Negligence
### (MARATHON OIL COMPANY– "Marathon")

745. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 744 as if fully set out in this Count LV.

746. Defendant Marathon is an independent international exploration and production company, based in Houston, Texas, with a resource portfolio whose centerpiece is the North Dakota Bakken Shale oil play.

747. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Marathon is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a

hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

748. Upon information and belief, Defendant Marathon, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

749. At all times relevant to this Complaint, Defendant Marathon was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

750. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Marathon.

751. At all times relevant herein, Defendant Marathon owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

752. Upon information and belief, Defendant Marathon breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

     a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and

liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.  Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.  Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank

241

cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

753. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Marathon, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

754. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

755. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

756. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Marathon, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count LVI – Wrongful Death – Negligence
### (QEP RESOURCES, INC – "QEP")

757. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 756 as if fully set out in this Count LVI.

758. Defendant QEP is an independent crude oil and natural gas exploration and production company with significant crude oil development properties in the Williston Basin.

759. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant QEP is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

760. Upon information and belief, Defendant QEP, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold, or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

761. At all times relevant to this Complaint, Defendant QEP was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

762. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant QEP.

763. At all times relevant herein, Defendant QEP owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

764. Upon information and belief, Defendant QEP breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a. Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and analysis of the Bakken Formation crude oil to determine how the nature of

its risk profile differed from that of crude oil from other known North American sources.

b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank

245

cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.   Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) the Bakken crude oil it supplied  to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.   Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken

246

crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

i.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

j.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

765. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant QEP, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

766. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and

society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

767. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

768. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant QEP, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count LVII – Wrongful Death – Negligence
### <u>(SLAWSON EXPLORATION COMPANY, INC. – "Slawson")</u>

769. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 768 as if fully set out in this Count LVII.

770. Defendant Slawson is a privately held oil and gas exploration company with drilling operations in ten states and multiple basins, including the Williston Basin, where it has drilled in the Bakken for decades.

771. As an owner, operator, and/or supplier of hazardous material requiring commercial transportation, Defendant Slawson is responsible for determining the hazard class of hazardous materials it ships; selecting the appropriate container for the shipment of hazardous materials; correctly marking and labeling containers to indicate that they hold a hazardous material; and loading, blocking, and bracing hazardous materials shipped in a freight container.

772. Upon information and belief, Defendant Slawson, either directly or indirectly through an agent, subsidiary or joint venture, produced, sold or supplied crude oil from the Bakken Formation to World Fuel Services which constituted a portion of the Irving Shipment that was transported in the DOT-111 tanker cars that derailed and ruptured in Lac-Mégantic on July 6, 2013.

773. At all times relevant to this Complaint, Defendant Slawson was aware or should have been aware that crude oil produced from the Bakken Formation had a dangerously low flash point and/or other characteristics that made it more highly volatile than other crude oil from other locations.

774. At all times relevant to this Complaint, the dangerous design defects of the DOT-111 tanker cars with respect to the transport of dangerous materials such as crude oil were known or should have been known to Defendant Slawson.

775. At all times relevant herein, Defendant Slawson owed a duty to the public at large, including the Plaintiff's decedent Henriette Latulippe, to operate its businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

776. Upon information and belief, Defendant Slawson breached its duty to the Plaintiff's decedent Henriette Latulippe, including but not limited to the following actions and inactions:

    a.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources because of the presence of volatile vapors, gases, and liquids, Defendant failed to conduct, and/or failed to direct that its subsidiaries or its joint ventures conduct, a proper investigation and

analysis of the Bakken Formation crude oil to determine how the nature of its risk profile differed from that of crude oil from other known North American sources.

b.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to establish, and/or failed to direct that its subsidiaries or its joint ventures establish, safety protocols to analyze and properly identify the unique risk profile of Bakken Formation crude oil compared to crude oil produced from other North American sources before it was shipped through densely populated urban areas.

c.  Despite its knowledge that crude oil produced from the Bakken Formation presents a higher risk of self-ignition and explosion than crude oil from other North American sources, Defendant failed to warn, and/or failed to direct that its subsidiaries or its joint ventures warn, purchasers and transporters in the chain of commerce of the unique risk profile of Bakken Formation crude oil in one or more of the following ways: 1) by failing to indicate that the shipment contained "Bakken Crude"; 2) by failing to indicate a Packing Group; 3) by mislabeling the shipment as "Packing Group III" (low danger) or "Packing Group II" (moderate danger); or 4) by labeling the shipment as "Packing Group I" but failing specify a safety protocol for the transport of Bakken crude oil.

d.  Despite its knowledge that DOT-111 tank cars are routinely used to transport crude oil, Defendant failed to specify, and/or failed to direct its subsidiaries, joint ventures, and/or agents to specify, that DOT-111 tank

cars are unsafe for the transport of "Bakken Crude" because of its unique risk of self-ignition and explosion.

e.   Despite its awareness of the well-known rupture risk of DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures and/or agents to direct or allow) the Bakken crude oil it supplied to be transported using DOT-111 tank cars, which were prone to rupture in the event of a derailment.

f.   Despite its knowledge of the well-known rupture risk of the DOT-111 tanker cars, Defendant carelessly and negligently failed to include in their safety protocols (and/or failed to direct that its subsidiaries, joint ventures, and/or agents include in their safety protocols) the review of the safety record of all carriers involved in the transport of Bakken crude oil.

g.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures and/or agents to direct or allow) shipments containing Bakken crude oil to be transferred to the Debtor, a railway company with a poor safety record.

h.   Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing of Bakken

crude oil to be transferred to the Debtor, a railway company which operated its trains with a single crew member.

    i.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be transferred to the Debtor without providing the Debtor any warning of the heightened volatility of the contents.

    j.  Despite its awareness that Bakken crude oil presents a higher risk of self-ignition and explosion than crude oil from other North American sources and despite its awareness of the well-known rupture risk of the DOT-111 tank cars, Defendant directed and/or allowed (and/or allowed its subsidiaries, joint ventures, and/or agents to direct or allow) a shipment containing Bakken crude oil to be routed through densely populated urban areas without providing any warning to the involved communities as to the catastrophic damage that would result if there was a derailment.

777. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Slawson, Plaintiff's decedent Henriette Latulippe suffered greatly and burned to death when DOT-111 tanker cars derailed, ruptured, and exploded in Lac-Mégantic on July 6, 2013.

778. By reason of the untimely death of Henriette Latulippe, the decedent's next of kin suffered certain injuries and losses, including grief, sorrow and the loss of companionship and

society, all of which are compensable under the Illinois Wrongful Death Act, 740 ILCS 180, *et seq.*

779.  The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages such as lost income, in addition to funeral expenses and costs and other expenses associated with the decedent's untimely demise.

780.  The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, prays for judgment in favor of the estate and against the Defendant Slawson, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, Marie-Josée Grimard, as Special Administrator of the Estate of Henriette Latulippe, deceased, herein demands a jury trial on all issues so triable.

Dated:  July 02, 2015

Respectfully submitted,
MARIE-JOSÉE GRIMARD (O/B/O
JEAN-GUY
VEILLEUX) AND MARIE-JOSEE
GRIMARD (O/B/O HENRIETTE
LATULIPPE)

By their attorneys,

/s/ Peter J. Flowers, Esq.
Peter J. Flowers, Esq.
Cook County Firm No.: 56079
MEYERS & FLOWERS, LLC
St. Charles Office
3 N Second Street, Suite 300
St. Charles, IL 60174
(630) 232-6333
(630) 845-8982 (fax)

Chicago Office
225 West Wacker Drive, Suite 1515
Chicago, IL 60606

/s/ Jason C. Webster, Esq.
Jason C. Webster, Esq.
(Texas Bar No. 24033318)
THE WEBSTER LAW FIRM
6200 Savoy, Suite 515
Houston, Texas 77036
(713) 581-3900
(713) 581-3907 (fax)

/s/ George W. Kurr,Jr., Esq.
George W. Kurr, Jr., Esq.
GROSS, MINSKY & MOGUL, P.A.
23 Water Street, Suite 400
P. O. Box 917
Bangor, ME 04402-0917
Phone: (207) 942-4644 ext. 206
Fax: (207) 942-3699
gwkurr@grossminsky.com

254