SCANNED  COPY

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED LAW DIVISION
2013 JUL 29 PM 12: 03
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

|  |  |  |
|---|---|---|
| MARIE-JOSÉE GRIMARD, as Special Administrator of the ESTATE OF HENRIETTE LATULIPPE, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | No. |
| MONTREAL, MAINE and ATLANTIC RAILWAY, INC., RAIL WORLD, INC., EDWARD BURKHARDT, individually, WORLD FUEL SERVICES CORPORATION, WESTERN PETROLEUM COMPANY, PETROLEUM TRANSPORT SOLUTIONS, LLC, DAKOTA PLAINS TRANSLOADING, LLC, DAKOTA PETROLEUM TRANSPORT SOLUTIONS, LLC., DAKOTA PLAINS MARKETING, LLC., and DPTS MARKETING, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **TRIAL BY JURY DEMANDED** |
| Defendants. | ) | |

No. 2013L008534
CALENDAR/ROOM C
TIME 00:00
PI Other

Scanned by:
Folder Location:
File Name:
Names of Attachments, if any: 2

## COMPLAINT AT LAW

NOW COMES the Plaintiff, MARIE-JOSÉE GRIMARD, Guardian of the Estate of Lea

Favreau, and as Special Administrator of the Estate of HENRIETTE LATULIPPE, deceased, by

and through her attorneys, MEYERS & FLOWERS, LLC and THE WEBSTER LAW FIRM,

and complaining against Defendants, MONTREAL, MAINE AND ATLANTIC RAILWAY,

INC., RAIL WORLD, INC., EDWARD BURKHARDT, WORLD FUEL SERVICES

CORPORATION, WESTERN PETROLEUM COMPANY, PETROLEUM TRANSPORT

SOLUTIONS, LLC, DAKOTA PLAINS TRANSLOADING, LLC, DAKOTA PETROLEUM

TRANSPORT SOLUTIONS, LLC, DAKOTA PLAINS MARKETING, LLC, and DPTS

MARKETING, LLC, states as follows:

## Introduction: the 'Disaster'

Shortly after midnight on July 6, 2013, an unattended parked freight train hauling seventy-two tankers filled with crude oil rolled downhill seven and one-half miles before derailing in the town of Lac-Mègantic, rupturing several of the tankers and resulting in an explosion and fire that killed more than forty-five people, injured scores of others and turned the picturesque community into a scene from a war zone.

## The Parties

1. Plaintiff MARIE-JOSÉE GRIMARD, is the de facto guardian of her minor daughter, Lea Favreau, and has been appointed as the special administrator of the Estate of HENRIETTE LATULIPPE, deceased, who was killed in the Disaster. MARIE-JOSÉE GRIMARD is the daughter of HENRIETTE LATULIPPE. HENRIETTE LATULIPPE was a Canadian citizen and a resident of the town of Lac-Mègantic, Quebec.

2. Defendant MONTREAL, MAINE AND ATLANTIC RAILWAY, INC. (hereinafter "MM&A") operated the train involved in the Disaster. MM&A is a Maine corporation with its corporate headquarters in Hermon, Maine.

3. Defendant RAIL WORLD, INC. (hereinafter "RailWorld") is the parent company of MM&A. RailWorld is an Illinois corporation with corporate offices in the Village of Rosemont, Cook County, Illinois.

4. Defendant EDWARD BURKHARDT (hereinafter "Burkhardt") is the president and chief executive officer of RailWorld and the chairman of MM&A. Burkhardt is a resident of Cook County, Illinois.

5. Defendant WORLD FUEL SERVICES CORPORATION (hereinafter "WorldFuel") is a Florida corporation with corporate offices in Miami, Florida, as well as Chicago, Illinois.

6. Defendant WESTERN PETROLEUM COMPANY (hereinafter "WesternPetroleum") is a Minnesota corporation and is a wholly owned subsidiary of WorldFuel.

7. Defendant PETROLEUM TRANSPORT SOLUTIONS, LLC (hereinafter "PetroleumTransport") is a Minnesota limited liability company and is a wholly owned subsidiary of WesternPetroleum.

8. Defendant DAKOTA PLAINS TRANSLOADING, LLC (hereinafter "DakotaTransloading") is a Minnesota limited liability company and a wholly owned subsidiary of Dakota Plains Holdings, Inc., a Nevada corporation.

9. Defendant DAKOTA PETROLEUM TRANSPORT SOLUTIONS, LLC (hereinafter "DakotaTransport") is a Minnesota limited liability company whose Members are PetroleumTransport and DakotaTransloading.

10. Defendant DAKOTA PLAINS MARKETING, LLC. (hereinafter "DakotaMarketing") is a Minnesota limited liability company and a wholly owned subsidiary of Dakota Plains Holdings, Inc., a Nevada corporation.

11. Defendant DPTS Marketing, LLC (hereinafter "DPTS") is a Minnesota limited liability company whose Members are PetroleumTransport and DakotaMarketing.

## Allegations Common to All Counts

12. Since 2006, crude oil production from shale in the Bakken Formation in North Dakota has increased 150-fold to more than 660,000 barrels a day, moving the state into second place among domestic suppliers.

13. With the increase in production, the transport of North Dakota crude oil to refineries has become largely dependent upon the rail system, with a 256% increase in barrels transported

3

by train reported nationally from 2011 to 2012. With respect to the region where the Lac-Mègantic disaster occurred (Maine/New Brunswick) the increase during the same period has been exponential, growing from 25,000 barrels shipped by train per year to 5.2 million barrels shipped by train per year.

14. For over twenty years, the transportation of crude oil by train in the United States and Canada has been accomplished by tanker cars, with the bulk of such shipments being made by the tanker car design known as the "DOT-111" in the United States and the "CTC-111A" in Canada (hereinafter collectively referred to as the "DOT-111").

15. In 2012, it was estimated that 80% of the Canadian fleet of tanker cars and 69% of the US fleet of tanker cars are DOT-111's.

16. For more than twenty years, problems with DOT-111 tankers rupturing upon derailment have been well documented by government safety regulators and media outlets. For example, the Associated Press upon review of United States federal accident data found that DOT-111 tankers carrying ethanol had breached in forty serious accidents since 2000.

17. As a result of the clear danger to the public, for many years the United States National Transportation Safety Board ("NTSB") has urged the railroad and petroleum industries to retrofit existing DOT-111's with reinforced hulls and shields on each end of the tank; however, the transport industry has rebuffed these efforts to avoid the anticipated costs.

18. The railroad and petroleum industries have long acknowledged the design flaws in the DOT-111, but have consistently ignored the NTSB's calls to address the dangers associated with rupture of the tankers.

19. In 2009, thirteen DOT-111's ruptured in a derailment in Cherry Valley, Illinois, resulting in the spillage of 324,000 gallons of ethanol into the Rock River.

**20.** As a result, in part, of the Cherry Valley spill, the transport and petroleum industries voluntarily proposed that after October 2011 all purchases of tanker cars for use in the transport of petroleum products would include the safety features recommended by the NTSB and the Association of American Railroads (the "AAR") to improve their crashworthiness, including tank heads and shells to be constructed of normalized steel, with $\frac{1}{2}$-inch thick half head shields; however, the transport and petroleum industries refused to voluntarily comply with the NTSB's request that all DOT-111's be retrofitted to meet the new standards recommended by the AAR.

**21.** According to the NTSB, the industries' proposal in 2011 to address only the safety of newly purchased DOT-111's ignored the safety risks posed by the tens of thousands of DOT 111 tanker cars currently in use; however, Congress did not grant the NTSB authority to impose its safety recommendations.

**22.** In March 2013, the NTSB requested that the Federal Pipeline and Hazardous Materials Safety Administration, which does have the authority to mandate safety improvements, impose the new tanker design standards on the transport and petroleum industries noting that the industries' proposal: "ignores the safety risks posed by the current fleet" as existing non-retrofitted DOT-111's "can almost always be expected to breach in derailments that involve pileups or multiple car-to-car impacts."

**23.** On or about July 4, 2013, Canadian Pacific Railway locomotives picked up the seventy-two DOT-111's tankers filled with crude oil that ultimately derailed in Lac-Mègantic on July 6 from the New Town, North Dakota intermodal facility operated by Defendants DakotaTransloading, PetroleumTransport and DakotaTransport.

**24.** On information and belief, the transportation of the seventy-two DOT-111 tankers from New Town, North Dakota to the oil refinery in Saint John, New Brunswick which derailed

en route in Lac-Mègantic on July 6 was arranged by DPTS, with the assistance of DakotaMarketing and PetroleumTransport.

25. On or about July 5, 2013, the Canadian Pacific train reached Cote Saint-Luc where it handed off the ill-fated seventy-two DOT-111 tankers to the MM&A.

26. On information and belief, the five MM&A locomotives which drove the seventy-two tankers was operated by a crew of one engineer.

27. The MM&A train changed 'crews' in Farnham after its arrival from Cote Saint-Luc, and an MM&A engineer, Tom Harding ("Harding"), took charge of the train.

28. According to work rules, Harding stopped in Nantes around 11:25PM and parked the train on the main line.

29. After parking the train, Harding set the brakes, shut down all the train's locomotives except the lead engine and, pursuant to MM&A policy, abandoned the train so he could catch some sleep at a local hotel.

30. Sometime before midnight on July 5, 2013, the Nantes Fire Department and a police officer responded to a 911 call relating to a fire on the first MM&A locomotive. Dutifully, the Nantes Fire Department notified MM&A which dispatched a track maintenance employee to the scene.

31. Per protocol provided by MM&A, the Nantes Fire Department powered down the locomotive's engine before attending to the flames.

32. The Nantes Fire Department extinguished the fire by 12:15AM and the firefighters left the scene in the custody of the MM&A track maintenance employee who assured the firemen that everything was ok and that their further assistance was unnecessary.

33. The MM&A track maintenance employee left the scene shortly thereafter.

**34.** With no locomotive engine running, the train's air-brake system lost power and eventually the brake block that prevents the wheels from turning was released.

**35.** Shortly after the MM&A track maintenance employee left the scene, the unattended train, without the benefit of an operating air-brake system, began rolling in the direction of Lac-Mégantic.

**36.** At or about 1:15AM., the unattended MM&A runaway train entered downtown Lac-Mégantic at a high rate of speed.

**37.** Although the locomotive engines were able to negotiate a sharp curve in the tracks, the DOT-111 tankers, with their higher center of gravity, began derailing.

**38.** Over twenty DOT-111 derailed tanker cars left the tracks and careened into each other, and due to their well-documented design flaw, immediately ruptured and spilled over a million gallons of oil into the streets, storm sewers, manholes, basements, businesses, and homes adjacent to the tracks.

**39.** Soon thereafter, the crude oil ignited and then exploded, incinerating everyone and everything in the immediate area.

**40.** It is estimated that more than one and one-half million gallons of crude oil spilled from the DOT-111 tankers, most of it fuel to the explosions and fire, with the remainder polluting the picturesque lake which the town is named after.

**41.** On July 6, 2013, Plaintiff's decedent, HENRIETTE LATULIPPE was present in downtown Lac-Mègantic near the site of the derailment and was consumed by the fire and explosion.

## Count I - Wrongful Death-Negligence
## (MONTREAL, MAINE AND ATLANTIC RAILWAY, INC.)

**42.** The Plaintiff incorporates and alleges general allegation paragraphs 1 through 41 as if fully set out in this Count I.

**43.** On July 6, 2013, and at all times relevant herein, Defendant MM&A owed a duty to the public at large, including the Plaintiff's decedent, HENRIETTE LATULIPPE, to operate its business in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries, and to that end to operate its railroad in a safe manner so that its trains do not derail.

**44.** Despite said duty, Defendant MM&A was guilty of one or more of the following wrongful acts and/or omissions:

a. Carelessly and negligently failed to adequately staff its trains;

b. Carelessly and negligently failed to train its employees to properly set brakes when trains are left unattended;

c. Carelessly and negligently required that a train carrying flammable liquids be left unattended;

d. Carelessly and negligently trained its employees on safety protocol when an unattended train carrying flammable liquids catches fire;

e. Carelessly and negligently failed to warn local municipalities and first responders as to the dangers associated with an engine fire on an unattended train carrying flammable liquids;

f. Carelessly and negligently agreed to transport DOT 111 tankers filled with flammable liquids;

g. Carelessly and negligently transported DOT 111 tankers filled with flammable liquids;

h. Carelessly and negligently failed to take notice of dangerous and unsafe operating conditions;

i. Carelessly and negligently failed to appreciate defects in the track condition;

j. Carelessly and negligently failed to appreciate defects in its trains; and

k. Carelessly and negligently failed to operate its trains in a reasonably safe manner.

**45.** As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant MM&A, the Plaintiff's decedent, HENRIETTE LATULIPPE, was burned to death as a result of the derailment of MM&A's train and rupture of the DOT-111 tanker cars on July 6, 2013, and suffered greatly prior to her demise.

**46.** By reason of the untimely death of HENRIETTE LATULIPPE, her daughter, MARIE-JOSÉE GRIMARD and her granddaughter, Lea Favreau, suffered certain injuries and losses, including loss of companionship and society, grief and sorrow, all of which are compensable under the Wrongful Death Act, 740 ILCS 180, *et seq.*

**47.** The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages including lost income in addition to funeral expenses and costs and other expenses associated with his untimely demise.

**48.** The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE,** the Plaintiff, as Administrator of the Estate of HENRIETTE LATULIPPE, deceased, and on behalf of the Plaintiff's heirs, prays for judgment in their favor and against the Defendant, MM&A for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count II - Wrongful Death-Negligence
### (RAIL WORLD, INC)

**49.** The Plaintiff incorporates and alleges general allegation paragraphs 1 through 41 as if fully set out in this Count II.

**50.** RailWorld is a management and investment company formed in 1999 which purchases distressed railroads and manages their operations.

**51.** In 2003, RailWorld purchased the assets of two distressed railroads and formed the MM&A with operations in Canada and Maine.

**52.** Since its purchase, RailWorld has managed the operations of MM&A.

**53.** Defendant, Edward Burkhardt, is the President and CEO of RailWorld.

**54.** Defendant, Burkhardt, is the Chairman of MM&A.

**55.** Burkhardt has a long history in the operation of railways and is a darling in the investment community for his success in purchasing troubled rail transport companies and then restructuring them into profitable enterprises.

**56.** Burkhardt's first major success in the industry occurred in 1987 when he convinced a few investors to form the Wisconsin Central Transportation Corporation and purchased the assets of a division of the struggling Soo Line Railroad Company.

**57.** Immediately after the purchase, Burkhardt implemented his business plan to establish profitability by wringing out costs from the Soo Line operations.

**58.** One of Burkhardt's first steps in furtherance of his business plan was to disband the union and union work rules.

**59.** Pursuant to Burkhardt's business plan, Wisconsin Central was able to reduce crew sizes on freight trains from an average of 4.8 employees per train to 2.2 employees per train.

**60.** Burkhardt's plan quickly established profitability and Burkhardt brought the company public in 1991 as Wisconsin Central, Ltd (hereinafter "Wisconsin Central").

**61.** Although Wisconsin Central was hugely profitable, its accident rate increased dramatically under Burkhardt's leadership.

**62.** On March 4, 1996, a Wisconsin Central locomotive, manned by a single engineer, derailed in the center of the town of Weyauwega, Wisconsin, sending 34 cars off the tracks, 14

of which were loaded with propane or liquefied petroleum. An explosive fire erupted, and, although remarkably no one was killed, it took two weeks to put out the flames and more than 1,700 Weyauwega residents were forced to flee their homes.

63. The NTSB concluded that the probable cause of the Weyauwega accident was "...improper maintenance because Wisconsin Central management did not ensure that the two employees responsible for inspecting the track structure were properly trained."

64. In February 1997, federal rail safety officials announced that Wisconsin Central would be the subject of a thorough safety inspection because its accident rate was two to three times above the industry norm.

65. In November 1997, another Wisconsin Central train derailed and plowed into a factory in Fond du Lac, Wisconsin, causing the first train derailment death in Wisconsin in eleven years.

66. In 1997, the United States Federal Railroad Administration ordered Wisconsin Central to improve its safety practices pursuant to a safety compliance agreement.

67. In 1997, Wisconsin Central employees voted to unionize, inspired in part by management's lack of investment in the public's and employees' safety.

68. In July 1999, due to the lagging stock price caused in part by the Weyauwega and Fond du Lac accidents, the Board of Wisconsin Central voted to oust Burkhardt as Chairman.

69. In 1999, Burkhardt incorporated RailWorld and attracted investors based on his track record of cutting costs to return troubled rail transport companies to profitability.

70. In 2001, the Canadian Pacific purchased Wisconsin Central for $1.2 billion dollars. On information and belief, Burkhardt's share of the purchase price totaled over $50 million dollars.

**71.** In January, 2003, RailWorld purchased the assets of Bangor and Aroostock Railroad, which had previously been acquired by Iron Road Railways, and operated the assets as the Montreal, Maine and Atlantic Railway ("MM&A").

**72.** The main goods transported by MM&A were forest and paper products; however, shortly after RailWorld's acquisition, several of its major customers shut down their mills.

**73.** MM&A's problems escalated due to the housing recession of 2008 and the severe drop in demand for lumber.

**74.** MM&A's loss of lumber shipping revenue put further pressure on RailWorld to cut MM&A's expenditures at the expense of the safety of its operations.

**75.** In late 2011, MM&A, at the direction of RailWorld, entered into an agreement to transport crude oil over its tracks to Irving Oil Company's refinery in St John, New Brunswick, Canada.

**76.** RailWorld knew or should have known that, as a result of the agreement, MM&A would be transporting DOT-111 tankers containing flammable crude oil.

**77.** Burkhardt and RailWorld knew that the design defects associated with DOT-111 tanker cars nearly guaranteed tank rupture upon derailment and the consequent spillage of their contents.

**78.** RailWorld knew that its poor safety record and poor state of its tracks posed a serious risk to the public, especially in regard to the transport of crude oil in DOT-111 tanker cars.

**79.** Despite the flammable nature of crude oil, MM&A's poor safety record and the tendency of DOT-111 tankers to rupture, RailWorld directed MM&A to obtain a permit from the Canadian government to allow it to operate its freight trains with a single crew member.

**80.** On July 6, 2013, and at all times relevant herein, Defendant RailWorld owed a duty to the public at large, including the Plaintiff's decedent, HENRIETTE LATULIPPE, to

operate its business in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries, and to that end to direct MM&A, which it managed, to operate its railroad in a safe manner so that its trains do not derail.

**81.** Despite said duty, Defendant RailWorld was guilty of one or more of the following wrongful acts and/or omissions:

a. Carelessly and negligently established a business plan which did not allow MM&A to adequately staff its trains;

b. Carelessly and negligently established a business plan which did not provide MM&A the resources to properly train its employees on how to safely leave a train unattended for the night;

c. Carelessly and negligently established a business plan which required MM&A to allow a train carrying flammable liquids be left unattended;

d. Carelessly and negligently established a business plan which did not provide MM&A the resources to train its employees on safety protocol when an unattended train carrying flammable liquids catches fire when left unattended;

e. Carelessly and negligently established a business plan which did not provide MM&A the resources to establish a protocol to warn local municipalities and first responders as to the dangers associated with an engine fire on an unattended train carrying flammable liquids;

f. Carelessly and negligently established a business plan which required MM&A to transport DOT 111 tankers filled with flammable liquids on a train conducted by a single crew member;

g. Carelessly and negligently established a business plan which did not provide MM&A the resources to maintain its tracks in a reasonably safe condition;

h. Carelessly and negligently established a business plan which did not provide MM&A the resources to take notice of dangerous and unsafe operating conditions;

i. Carelessly and negligently established a business plan which did not provide MM&A the resources to appreciate defects in its trains; and

j. Carelessly and negligently established a business plan which did not provide MM&A the resources to operate its trains in a reasonably safe manner.

**82.** As a direct and proximate result of one or more of the above negligent acts and/or omissions of    Defendant RailWorld, the Plaintiff's decedent, HENRIETTE

LATULIPPE, was burned to death as a result of the derailment of MM&A's train and rupture of the DOT-111 tanker cars on July 6, 2013, and suffered greatly prior to her demise.

83. By reason of the untimely death of HENRIETTE LATULIPPE, her daughter, MARIE-JOSÉE GRIMARD and her granddaughter, Lea Favreau, suffered certain injuries and losses, including loss of companionship and society, grief and sorrow, all of which are compensable under the Wrongful Death Act, 740 ILCS 180, *et seq.*

84. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages including lost income in addition to funeral expenses and costs and other expenses associated with his untimely demise.

85. The Plaintiff seeks damages in excess of $1,000,000.00.

WHEREFORE, the Plaintiff, as Administrator of the Estate of HENRIETTE LATULIPPE, deceased, and on behalf of the Plaintiff's heirs, prays for judgment in their favor and against the Defendant, RailWorld for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## Count III - Wrongful Death-Negligence
## (EDWARD BURKHARDT)

86. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 41 and paragraphs 49 through 80 of Count II as if fully set out in this Count III.

87. On information and belief, since the time that Burkhardt formed RailWorld in 1999, he has personally exerted complete control of the management decisions of the company, especially with respect to the business plan RailWorld implemented at his behest in regard to the operations of the MM&A.

**88.** Burkhardt knew or had reason to know that his business plan which sacrificed safety for the sake of profits would ultimately lead to more train accidents.

**89.** Burkhardt knew or had reason to know that the MM&A was not qualified to safely transport crude oil and that his direction that MM&A's locomotives move DOT-111 tanker cars posed a real and present danger to the people and property located near its tracks.

**90.** On July 6, 2013, and at all times relevant herein, Defendant Burkhardt owed a duty to the public at large, including the Plaintiff's decedent, HENRIETTE LATULIPPE, to operate RailWorld in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries, and to that end to direct the operation of RailWorld in a safe manner and to direct MM&A, which Burkhardt managed through his position at both RailWorld and MM&A, to operate its railroad in a safe manner so that its trains do not derail.

**91.** Despite said duty, Defendant Burkhardt was guilty of one or more of the following wrongful acts and/or omissions:

a. Carelessly and negligently established a business plan which did not allow MM&A to adequately staff its trains;

b. Carelessly and negligently established a business plan which did not provide MM&A the resources to properly train its employees on how to safely leave a train unattended for the night;

c. Carelessly and negligently established a business plan which required MM&A to allow a train carrying flammable liquids be left unattended;

d. Carelessly and negligently established a business plan which did not provide MM&A the resources to train its employees on safety protocol when an unattended train carrying flammable liquids catches fire when left unattended;

e. Carelessly and negligently established a business plan which did not provide MM&A the resources to establish a protocol to warn local municipalities and first responders as to the dangers associated with an engine fire on an unattended train carrying flammable liquids;

f. Carelessly and negligently established a business plan which required MM&A to transport DOT 111 tankers filled with flammable liquids on a train conducted by a single crew member;

g. Carelessly and negligently established a business plan which did not provide MM&A the resources to maintain its tracks in a reasonably safe condition;

h. Carelessly and negligently established a business plan which did not provide MM&A the resources to take notice of dangerous and unsafe operating conditions;

i. Carelessly and negligently established a business plan which did not provide MM&A the resources to appreciate defects in its trains; and

j. Carelessly and negligently established a business plan which did not provide MM&A the resources to operate its trains in a reasonably safe manner.

92. As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendant Burkhardt, the Plaintiff's decedent, HENRIETTE LATULIPPE, was burned to death as a result of the derailment of MM&A's train and rupture of the DOT-111 tanker cars on July 6, 2013, and suffered greatly prior to her demise.

93. By reason of the untimely death of HENRIETTE LATULIPPE, her daughter, MARIE-JOSÉE GRIMARD and her granddaughter, Lea Favreau, suffered certain injuries and losses, including loss of companionship and society, grief and sorrow, all of which are compensable under the Wrongful Death Act, 740 ILCS 180, *et seq*.

94. The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages including lost income in addition to funeral expenses and costs and other expenses associated with his untimely demise.

95. The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE**, the Plaintiff, as Administrator of the Estate of HENRIETTE LATULIPPE, deceased, and on behalf of the Plaintiff's heirs, prays for judgment in

their favor and against the Defendant, Burkhardt for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

### Count IV - Wrongful Death-Negligence
**(DAKOTA PLAINS TRANSPORT SOLUTIONS, LLC.**
**DAKOTA PLAINS TRANSLOADING, LLC**
**PETROLEUM TRANSPORT SOLUTIONS**
**WESTERN PETROLEUM COMPANY**
**WORLD FUEL SERVICES CORPORATION**
**DAKOTA MARKETING, LLC**
**DPTS MARKETING, LLC)**

96. The Plaintiff incorporates and alleges general allegation paragraphs 1 through 41, paragraphs 49 through 80 of Count II, and paragraphs 87 through 89 of Count III as if fully set out in this Count IV.

97. On information and belief, DakotaTransloading and PetroleumTransport each own a 50% Membership Interest in DakotaTransport and pursuant to a certain Member Control Agreement, DakotaTransloading, Petroleum Transport and DakotaTransport operate an intermodal rail loading facility in New Town, North Dakota where the crude oil which exploded in Lac Mègantic on July 6, 2013 was originally loaded into DOT-111 tanker cars.

98. Pursuant to the Member Control Agreement, DakotaTransloading, or an affiliate, would acquire the New Town intermodal facility, including the equipment needed to operate the facility, and then lease the facility back to DakotaTransport. In addition, under the Member Control Agreement, DakotaTransloading is obligated to assist DakotaTransport with the operations at the facility using its contacts with producers, marketers and transporters of hydrocarbons.

99. Pursuant to the Member Control Agreement, PetroleumTransport leased four trailer-mounted transloaders for use at the New Town facility and is responsible for the day-to-day

operations of the entire facility, either directly or through services contracted through DakotaTransport. In addition, under the Member Control Agreement, PetroleumTransport is to assist DakotaTransport with its operations using its contacts with producers, marketers and transporters of hydrocarbons.

**100.** The New Town intermodal facility loads tanker train cars with crude oil trucked to the facility from wells which pump shale oil from the Bakken Formation.

**101.** The New Town intermodal facility is currently being expanded to increase its train tanker loading capacity from 30,000 to 80,000 barrels per day.

**102.** Defendant PetroleumTransport is a wholly owned subsidiary of WesternPetroleum.

**103.** Defendant WesternPetroleum is a wholly owned subsidiary of WorldFuel.

**104.** Defendants WorldFuel and WesternPetroleum are parties to a joint venture agreement which requires that all crude oil which they purchase or produce from the Bakken Formation be 'marketed' by Defendant DPTS, which is owned 50% by DakotaMarketing and 50% by PetroleumTransport.

**105.** On information and belief, pursuant to their agreement with DPTS, DakotaMarketing and PetroleumTransport are obligated to actively assist DPTS with its marketing operations by using their contacts with producers, marketers and transporters of hydrocarbons.

**106.** In the context of the petroleum industry, 'marketing' is the process of purchasing crude oil from the wellhead, or in the 'field' and arranging for its delivery to the refinery.

**107.** On July 6, 2013, and at all times relevant herein, Defendants, DakotaTransloading, PetroleumTransport, DakotaTransport, WesternPetroleum, WorldFuel, DakotaMarketing and DPTS, owed a duty to the public at large, including the Plaintiff's

decedent, HENRIETTE LATULIPPE, to operate their businesses in a safe manner and to take reasonable measures to avoid exposing the public to the dangers associated with the transport of crude oil to refineries.

**108.** Despite said duty, Defendants, DakotaTransloading, PetroleumTransport, DakotaTransport, WesternPetroleum, WorldFuel, DakotaMarketing and DPTS acting pursuant to their joint ventures and agreements, were guilty of one or more of the following wrongful acts and/or omissions:

a. Despite their knowledge of the well-known rupture risk of the DOT-111 tanker cars, carelessly and negligently used DOT-111 tanker cars, which had not been retrofitted to meet the safety recommendations of the NTSB and AAR, to transport flammable petroleum products;

b. Despite their knowledge of the well-known rupture risk of the DOT-111 tanker cars, carelessly and negligently failed to review the safety record of all carriers involved in the transport of such tanker cars to the refinery;

c. Despite their knowledge of the well-known rupture risk of the DOT-111 tanker cars, carelessly and negligently allowed the DOT-111 tanker cars to be transported by a railway carrier which they knew or should have known:

    i. Was wholly owned and managed by a company controlled by Burkhardt, who had a reputation in the transportation industry for cutting costs at the expense of safety;

    ii. Had a safety record three times worse than the industry average;

    iii. Failed to train its employees to properly set brakes when trains are left unattended;

    iv. Allowed its trains carrying flammable liquids be left unattended;

    v. Failed to establish adequate safety protocols for its employees to deal with fires on its unattended trains which are carrying flammable liquids;

    vi. Failed to establish a special safety protocol when it transported DOT 111 tankers filled with flammable liquids;

    vii. Failed to maintain its tracks in a reasonably safe condition;

    viii. Failed to take notice of dangerous and unsafe operating conditions;

ix.   Failed to appreciate defects in the track condition;

x.    Failed to appreciate defects in its trains; and

xi.   Failed to operate its trains in a reasonably safe manner at this location.

**109.**   As a direct and proximate result of one or more of the above negligent acts and/or omissions of Defendants, DakotaTransloading, PetroleumTransport, DakotaTransport, WesternPetroleum, WorldFuel, DakotaMarketing and DPTS, Plaintiff's decedent, HENRIETTE LATULIPPE, was burned to death as a result of the derailment of MM&A's train and rupture of the DOT-111 tanker cars on July 6, 2013, and suffered greatly prior to her demise.

**110.**   By reason of the untimely death of HENRIETTE LATULIPPE, her daughter, MARIE-JOSÉE GRIMARD and her granddaughter, Lea Favreau, suffered certain injuries and losses, including loss of companionship and society, grief and sorrow, all of which are compensable under the Wrongful Death Act, 740 ILCS 180, *et seq.*

**111.**   The Plaintiff further seeks damages permitted by the Wrongful Death Act, including, but not limited to, future economic damages including lost income in addition to funeral expenses and costs and other expenses associated with his untimely demise.

**112.**   The Plaintiff seeks damages in excess of $1,000,000.00.

**WHEREFORE**, the Plaintiff, as Administrator of the Estate of HENRIETTE LATULIPPE, deceased, and on behalf of the Plaintiff's heirs, prays for judgment in their favor and against the Defendants, DakotaTransloading, PetroleumTransport, DakotaTransport, WesternPetroleum, WorldFuel, DakotaMarketing and DPTS, for all injuries and losses compensable under the Wrongful Death Act, costs of this litigation, and any other relief this Court deems appropriate.

## JURY DEMAND

MARIE-JOSÉE GRIMARD, Guardian of the Estate of Lea Favreau, and as Special Administrator of the Estate of HENRIETTE LATULIPPE, deceased, herein demands a trial by jury.

> MARIE-JOSÉE GRIMARD, Guardian of the Estate of Lea Favreau, and as Special Administrator of the Estate of HENRIETTE LATULIPPE, deceased
>
> MEYERS & FLOWERS, LLC
>
> _____
> Peter J. Flowers, One of its Attorneys

Peter J. Flowers, Esq.
*Cook County Firm No.: 56079*
MEYERS & FLOWERS, LLC
St. Charles Office
3 North Second Street, Suite 300
St. Charles, Illinois 60174
(630) 232-6333
(630) 845-8982 (fax)

Chicago Office
225 West Wacker Drive, Suite 1515
Chicago, Illinois 60606

Jason C. Webster, Esq.
*Pro Hac to be filed*
(Texas Bar No. 24033318)
THE WEBSTER LAW FIRM
6200 Savoy, Suite 515
Houston, Texas 77036
(713) 581-3900
(713) 581-3907 (facsimile)

F:\clients\pjf\Lac Megantic\Pleadings\Estate of Henriette Latulippe\Initial Documents\Complaint 07-26-13.docx